Troy, Paul E., J.
Plaintiffs, Thomas McQueen (“McQueen”) and Joel Gross (“Gross”), brought this action against Defendants True Partners Consulting LLC (“TPC”), True Partners Consulting Holdings LLC (“TPCH”) and Cary D. McMillan (“McMillan”) for issues arising from their termination as Managing Directors of TPC effective January 31,2009. Each plaintiff states eight identical claims summarized as follows:
Counts I and IX: Wage Act violation for failure to pay a bonus allegedly owed as of Plaintiffs’ termination date.
Counts II and X: Wage Act violation for failure to pay Plaintiffs’ “wages” allegedly earned after Plaintiffs’ termination.
Counts III and XI: Claim of unlawful retaliation under the Wage Act based upon Plaintiffs’ alleged demand for wages owed.
Counts IV and XII: Breach of contract claim based on TPC’s alleged failure to pay Plaintiffs compensation and benefits owed under their Managing Director Agreements with TPC.
Counts v. and XIII: Breach of contract claim based on Defendants’ alleged breach of a promise to repay capital contributions to Plaintiffs.
Counts VI and XIV: Breach of contract claim based upon TPC’s alleged failure to pay compensation and *412 benefits owed to Plaintiffs under an unspecified “Employment Contract.”
Counts VII and XV: Quantum meruit claim for the benefit and value of services that Plaintiffs allegedly rendered to TPC after their termination.
Counts VIII and XVI: Claim for breach of the implied covenant of good faith and fair dealing based upon TPC’s alleged termination of Plaintiffs “in an effort to avoid its financial obligations in the form of wages, bonuses, and other compensation.”
Defendants moved for summary judgment on all claims. For the reasons discussed below, Defendants’ Motion for Summary Judgment is DENIED as to counts Vil and XV and DENIED in part as to counts VIII and XVI to the extent that they are based on Defendants withholding payment. The court also DENIES summary judgment in part as to counts IV and XII to the extent that they are based on the late January draw payment. Defendants’ Motion for Summary Judgment is ALLOWED as to all other counts, including the remaining grounds of counts IV and XII not based on the late January draw payment.
BACKGROUND
The following facts are undisputed unless otherwise noted. TPC hired Plaintiffs in May 2007, and Plaintiffs each signed a Managing Director Agreement (“the Agreement”) with TPC and TPCH. Pursuant to the terms of the Agreement, Plaintiffs each purchased Class C Units in TPCH for $115,000. In consideration for services performed as Managing Directors, Plaintiffs each received a monthly draw payment from TPC to be distributed on the 7th of each month for work performed the previous month. Pursuant to Section 6 of the Agreement, Plaintiffs were eligible for an annual discretionary bonus at McMillan’s discretion. All Managing Directors were responsible for billing their clients and Plaintiffs sometimes “pre-billed” clients for work not yet performed.
On January 19, 2009, Plaintiffs met with John V. Aksak (“Aksak”), TPC’s Northeast Managing Director and Plaintiffs’ supervisor, and McMillan, who presented Plaintiffs with two options: 1) to remain with TPC under certain new conditions; or 2) to separate from TPC under certain separation terms. On January 21, 2009, Timothy L. Costello (“Costello"), TPC’s Chief Financial Officer, sent Plaintiffs an email providing more specifics on the first option. On January 28, 2009, Aksak sent Plaintiffs an email providing more detail on both options. On January 29, 2009, McQueen sent an email (copying Gross) to Mark Hellner (“Hellner”), TPC’s General Counsel at the time, asking for “the separation agreement you have drafted at McMillan’s request.” On January 30, 2009, TPC forwarded the separation agreements, which Plaintiffs never accepted. TPC terminated Plaintiffs’ employment under the Agreement on January 31, 2009. Plaintiffs retained counsel, but the parties continued to discuss terms of separation into February 2009.
On February 6, 2009, McMillan sent Plaintiffs an email expressing dissatisfaction with Plaintiffs’ January billings and suggesting that he may withhold the January draw payments. On February 9, 2009, McQueen responded via email, attaching an electronic document which addressed McMillan’s concerns and proposed certain separation terms. Approximately one hour later, McMillan replied with an email stating only “Thank you.” On February 10, 2009, Hellner sent Plaintiffs’ counsel an email detailing new proposed separation terms. On February 11, 2009, Hellner sent Plaintiffs’ counsel another email outlining modified proposal terms, which included payment of Plaintiffs’ owed January 2009 draws “assuming we can reach a settlement within the next few days.”
Plaintiffs were timely paid all draws until the January 2009 draw, which was due February 7, 2009. Plaintiffs did not receive the January draw on February 7, 2009, but received it several months later. Plaintiffs received a bonus payment for the 2007 year at the end of the 2007/2008 fiscal year and received a second bonus payment also for the 2007 year several months after beginning this action. The separation agreement drafted by Hellner but never accepted by Plaintiffs, and the parties’ negotiations, contemplated post-termination assistance by Plaintiffs on behalf of TPC. Gross submitted timesheets for Plaintiffs showing that Gross performed work in February for clients Iron Mountain, GPX, and Specialized Technology Resources and that McQueen performed work in February for clients GPX, Specialized Technology Resources, PerkinElmer, Inc., and TPI Composites. The parties dispute the extent of this work, but they agree that Plaintiffs’ February efforts led to TPC receiving a $9,850 reduction in a credit balance given to GPX in 2008.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating both the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
*413 I. WAGE ACT CLAIMS (COUNTS I, II, III, IX, X, AND XQ
Under the Wage Act (“the Act”), an employee whose employment is terminated must be paid earned wages in full on the day of discharge.[3] An employer who violates the act is subject to possible civil and criminal penalties, injunctive relief, treble damages, and attorneys fees and costs. G.L.c. 149, §§27C, 148, 150. The general purpose of the statute is “to assure that employees are paid their wages on a weekly basis,” Commonwealth v. Savage, 31 Mass.App.Ct. 714, 714 (1991), and to “prevent the unreasonable detention of wages.” Boston Police Patrolmen’s Assn. v. Boston, 435 Mass. 718, 720 (2002). Although the statute refers to holiday pay, vacation pay, and definitely determined commissions, it does not otherwise expressly define the term “wages.” G.L.c. 149, §148. To prevail on counts I, II, IX, and X, Plaintiffs must establish conclusively that: 1) they were “employees” within the meaning of the Act and 2) the contested payments were “wages” under the Act.
A. Bonus Payments Under the Act (Counts I and IX)
For the purposes of this motion, the parties stipulated that Plaintiffs were “employees” under the Agreement from May 2007 to January 31, 2009. Counts I and IX turn on whether the bonus payments are “wages” protected under the Act.
Our courts have consistently held that bonuses are not “wages” under the Act. In Weems v. Citicorp. Inc., 453 Mass. 147 (2009), the specific question of whether bonuses were wages regulated by the Act was certified to the Massachusetts Supreme Judicial Court. The Supreme Judicial Court definitively held discretionary bonuses to be outside the scope of “wages.” Id., see also Baptista v. Abbey Healthcare Group, Inc., No. 95-10125, slip-op (D.Mass. April 10, 1996) (specifically contrasting bonus from payment of wages, holding “there is no reason to extend the protections of the wage earner’s statute to cover bonuses potentially owing to highly paid executives . . .”). Plaintiffs attempt to distinguish Weems, but their argument that the bonuses here were “definitely determined” and therefore had “become due and payable” misses the mark. A plain reading of the statute reveals that the quoted statutory terms refer solely to commissions. Prozinski v. Northeast Real Estate Services, LLC, 59 Mass.App.Ct. 599, 604 (2003); see G.L.c. 149, §148. The operative fact is that the bonus awards are discretionary, and the employer is under no obligation to award them. Weems, 453 Mass. at 153-54. Here, the parties agree that the bonuses awarded to Managing Directors are discretionary and contingent on McMillan’s discretion. Consistent with the narrow construction that has been afforded the Act and the foregoing discussion, this court declines to expand the scope of the Act to cover Plaintiffs’ bonuses and grants Defendants summary judgment as to counts I and IX.
B. Plaintiffs’ “Wages” Earned after Termination (Counts II and X)
Counts II and X turn on whether Plaintiffs were “employees” as defined by the Act after their termination on January 31, 2009. Reading the plain language ofG.L.c. 149,§§148 and 150,this court concludes that Plaintiffs were not “employees” protected under the Act after January 31, 2009. See G.L.c. 149, §148. Plaintiffs concede that they were terminated on January 31, 2009. In addition, for reasons set forth below, this court concludes that the record fails to show that the parties created any employment contract other than the Agreement either before or after this termination date. Thus, Plaintiffs cannot establish that they were “employees” after January 31, 2009 pursuant to the Act and correspondingly cannot be owed “wages.” Plaintiffs’ claims for wages earned after their termination cannot prevail, and Defendants are granted summary judgment as to counts II and X.
C. Retaliation Claims (Counts III and XI)
Section 148A of the Act provides, “No employee shall be penalized by an employer in any way as a result of any action on the part of an employee to seek his or her rights under the wages and hours provision of this chapter,” and §150 provides that an employee may bring a civil action against his or her employer claiming a violation of §148A. Here, Plaintiffs have failed to present sufficient evidence to support their contention that they made any demands for payment of wages prior to their January 31, 2009 termination. The record does not permit a finding that Plaintiffs made such demands or that they were terminated in retaliation for those demands. Therefore, Plaintiffs’ retaliation claims cannot prevail, and Defendants are granted summary judgment as to counts III and XI.
II. CONTRACT CLAIMS (COUNTS IV, V, VI, XII, XIII, AND XIV)
In order to prevail on a breach of contract claim, the plaintiff must prove the existence of an agreement supported by consideration, that the plaintiff was ready, willing, and able to perform, that the defendant breached the contract, and that the plaintiff suffered damages for the breach. Singarella v. Boston, 342 Mass. 385, 387 (1961).
A. Breach of the Agreement (Counts IV and XII)
Plaintiffs claim that TPC breached the Agreement by failing to pay “compensation and benefits” owed to them. Defendants correctly identify the only three possible forms of “compensation and benefits” at issue: 1) the repurchase of Plaintiffs’ Class C Units in TPCH; 2) an amount of Plaintiffs’ 2007 bonus; and 3) Plaintiffs’ base compensation disbursed in monthly draws through January 31,2009. The court addresses each of these in turn.
1. Repurchase of Plaintiffs Class C Units
Judge Garsh, in a Memorandum of Decision and Order on Defendants’ Partial Motion to Dismiss *414 and/or for Summaiy Judgment and Motion to Strike Jury Demand, definitively held that Plaintiffs did not have a right to the repurchase of their Class C Units under the Agreement. See Memorandum of Decision and Order on Defendants’ Partial Motion To Dismiss and/or For Summary Judgment And Motion To Strike Jury Demand, at 2, Docket No. 09-00657 (October 13, 2009). For the same reasons, Plaintiffs’ claims regarding the Class C Units cannot survive.
2. Plaintiffs’ 2007 Bonus
Plaintiffs argue that they are owed “their early determined 2007 bonus.” However, they concede that they received a bonus payment at the end of the 2007/2008 fiscal year and later received a second bonus payment for the remaining amount at issue after beginning this action. Thus, Plaintiffs have received all bonus payments that they claim they were owed. The only question remaining is whether Defendants breached a contractual obligation to make the second payment at an earlier time.
Plaintiffs imply that the second bonus payment was contractually due at the time of their termination, however, they do not advance any evidence or caselaw to support this contention. The parties agree, and the Agreement unambiguously states, that McMillan had discretion to decide the amount of a bonus payment. McMillan decided to grant a bonus payment to all Managing Directors at the end of the 2007/2008 fiscal year, and decided to grant a second payment at a later time. Whether these two payments represented halves of a total bonus figure is immaterial. Plaintiffs do not articulate how the Agreement required Defendants to pay the second bonus distribution at an earlier time. Defendants could not have breached the contract without such a legal obligation. Thus, Plaintiffs’ breach of contract claim regarding the 2007 bonus cannot prevail.
3. Base Compensation Monthly Draws
Plaintiffs concede that all draws were timely paid until the January draw. The parties agree that the January draw was due on February 7, 2009. The parties also agree that TPC ultimately paid the January draw to Plaintiffs after this action commenced, although the record is unclear as to when exactly such payment occurred. Defendants arguments rely solely on the fact that payment was ultimately made. The late payment does not, however, erase the earlier breach. It is undisputed that Defendants did not pay the January draw when it was due.
Plaintiffs are entitled to such damages as are the natural and probable consequence of Defendants’ breach. Pierce v. Clark, 66 Mass.App.Ct. 912, 914 (2006). Plaintiffs may not demand “extraordinary or unforeseen elements of damage,” but only those logically related to the breach. Id., quoting Boylston Housing Corp. v. O’Toole, 321 Mass. 538, 562 (1947). While Plaintiffs are not required to prove damages to a mathematical certainty, “damages cannot be recovered when they are remote, speculative, hypothetical, and not within the realm of reasonable certainty.” Pierce, 66 Mass.App.Ct. at 914, quoting Kitner v. CTW Transport, Inc., 53 Mass.App.Ct. 741, 748 (2002).
There is at least a question of material fact as to the Defendants’ breach regarding the January draw payments and whether Plaintiffs suffered more than nominal damages as a proximate and foreseeable result. Thus, the court denies summary judgment as to counts IV and XII solely on the grounds of the January draw payments.
B. Breach of Other “Agreements” (Counts V, VI, XIII, and XIV)
Plaintiffs’ arguments on these counts are especially haphazard and confusing. Nevertheless, the court will attempt to address the substantive issues to the extent it can, and in an order that makes sense, based on the complaint and summary judgment materials as filed. Plaintiffs seem to argue on the grounds of a new created “Employment Contract,” oral modification, and promissory estoppel. They allege that at the January 19, 2009 meeting, McMillan promised to repay Plaintiffs’ capital contributions in exchange for their help securing receivables and fees from clients. For the reasons below, the court grants summary judgment as to all of these counts.
1. Creation of a New “Employment Contract”
Offer and acceptance are required for a contract to be formed. See O’Brien v. New England Telephone and Telegraph Co., 422 Mass. 686, 693 (1996). An offer is the manifestation by a party of its willingness to enter into a bargain, so made as to justify another party in understanding that his or her assent to that bargain is invited and will conclude it. Id. (citation omitted). When an offer calls for an act or conduct to be performed by the offeree, and the offeree performs that act or conduct in accordance with the offer, the offeree has accepted the offer, the offeror has received valuable consideration, and a unilateral contract is formed. Northampton Inst. for Savings v. Putnam, 313 Mass. 1, 7 (1943) (citation omitted). However, imperfect negotiations do not give rise to a contract. Blomendale v. Imbrescia, 25 Mass.App.Ct. 144, 147 (1987).
Plaintiffs concede that they never accepted the drafted separation agreement forwarded to them by Hellner on January 30, 2009. Thus, the separation agreement itself cannot serve as a legal basis for the creation of an alleged “Employment Contract.” Nor was such an agreement created at any other point. An expectation of an execution of a final written agreement justifies a strong inference that significant terms of the transaction must still be resolved and the parties do not intend to be bound. Green v. Royal Investments, Inc., 25 Mass.App.Ct. 137, 140 (1987) (citations omitted). Plaintiffs’ email to Hellner on January 29, 2009 requesting the prepared separation agreement indicates that the parties possessed such *415 an expectation. The parties agree that negotiations on separation terms following the Januaiy 19, 2009 meeting continued well into February.
Furthermore, considering the context and surrounding circumstances, no reasonable juror could conclude that McMillan’s February 9, 2009 email stating simply “Thank you” was an acceptance in response to McQueen’s February 9, 2009 email attachment. McMillan had requested that Plaintiffs send him certain clarifications and his “Thank you” response was merely acknowledgment of receiving same. Moreover, the separation terms mentioned in . McQueen’s email attachment described mutually exclusive alternatives; even if McMillan’s “Thank you" is read to convey “I accept,” such a response would neither make sense in context nor generate a decipherable set of agreed-upon terms. Reading McMillan’s email as an unqualified acceptance is both untenable and unreasonable, especially considering Plaintiffs’ business knowledge and experience. The fact that negotiations continued following this exchange further indicates that no acceptance occurred and no agreement was reached. Therefore, the parties never created a new “Employment Contract.”
2. Oral Modification
Similarly, the parties did not orally modify the existing Agreement. Generally, parties to a contract may agree, expressly or impliedly, to modify a written contract for consideration despite an existing agreement’s provision requiring amendments to be made only by a written instrument. Cambridgeport Sav. Bank v. Boersner, 413 Mass. 432, 439 (1992). A valid contract modification requires mutual assent and consideration. See Gishen v. Dura Corp., 362 Mass. 177, 182-83 (1972). Assent in this context can be inferred from the conduct of the parties and from the attendant circumstances, where the evidence warrants such an inference based on probabilities, not mere possibilities. Boersner, 413 Mass. at 439-41. In order to create a genuine issue of material fact, “(t]he evidence of a subsequent oral modification must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties.” Id. at 439 n.10.
The only evidence in the summary judgment record with respect to an oral modification of the Agreement is Plaintiffs’ self-serving testimony that McMillan agreed to repay the capital contributions. There is no other evidence, testimonial or documentary, that supports this allegation. There is, for example, no evidence that the parties’ conduct conformed with the alleged modification, insofar as neither party acknowledged the existence of such an agreement. Again, the parties’ expectation of a written separation agreement stating the final separation terms, and the fact that substantive negotiations continued, indicate a lack of consensus to modify the Agreement. Accordingly, the summary judgment record fails to raise a genuine issue of material fact as to whether the parties, for valuable consideration, entered into an oral modification. See id. at 439-42.
3. Promissory Estoppel
Plaintiffs also attempt to advance a theoy of promissory estoppel in their breach of contract claims. A plaintiff may recover on a theoy of promissory estop-pel by demonstrating that the defendant made a promise which he should reasonably have expected to induce action or forbearance of a definite and substantial character by the plaintiff, that the plaintiff reasonably relied on the promise to his detriment, and that injustice can be avoided only by enforcement of the promise. Loranger Constr. Corp. v. E.F. Hauserman Co., 376 Mass. 757, 760-61 (1978). Promissory estoppel thus permits a plaintiff to substitute reasonable reliance and detriment for the traditional element of consideration. Rhode Island Hosp. Trust Nat’l Bank v. Varadian, 419 Mass. 841, 849 (1995). Here, Plaintiffs’ reliance on Defendants’ alleged promises was unreasonable as a matter of law for the previously stated reasons. Accordingly, Plaintiffs’ promissoy estoppel arguments cannot prevail.
III. QUANTUM MERUIT CLAIMS (COUNTS VII AND XV)
There are two forms of quantum meruit: one based on contracts implied in fact, and the other on contracts implied in law. See Cape Painting & Carpentry Inc. v. Maher, 2009 Mass.App. Dec. 22 (2009), aff'd, 76 Mass.App.Ct. 1110 (2010). An implied-in-fact contract is a “true contract,” 1A. Corbin, Contracts §1.20 at 64 (rev. ed.1993), that may be “found to exist from the conduct and relations of the parties.” LiDonni, Inc. v. Hart, 355 Mass. 580, 583 (1969). An implied-in-law contract is a “fictitious contract” that is “created by the law for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent.” Corbin, supra; see Salamon v. Terra, 394 Mass. 857, 859 (1985). These two forms of quantum meruit require different remedies. When based on an implied-in-fact contract, the measure of recoveiy is the fair value of the plaintiffs services. See, e.g., Oatley v. Duprey, 312 Mass. 281, 285-86 (1942). When based on an implied-in-law contract, the measure of recoveiy is not the loss by the plaintiff, but rather the gain by the defendant. See Salamon, 394 Mass. at 859. The basis for the award is restitution, i.e., preventing the “unjust enrichment of one party and unjust detriment to the other party.” Id. The injustice of the enrichment or detriment equates with the defeat of a person’s reasonable expectations. Id.
Here, since the parties did not create a new contract following Plaintiffs’ termination on Januaiy 31, 2009, Plaintiffs’ quantum meruit claims relate only to the alleged post-termination “labor and services” and must rely on an implied-in-law contract. The appropriate measure of recovey is Defendants’ gain. Defen *416 dants argue that Plaintiffs cannot show “they conferred a valuable benefit upon TPC by virtue of their alleged post-termination ‘assistance.’ ” The record, however, indicates at least a dispute of material fact on this issue warranting denial of summary judgment.
Defendants concede that Plaintiffs’ February efforts led to a $9,850 reduction in a credit balance given to TPC’s client, GPX, in 2008. It is undisputed that a reduction in a credit balance, similar to payment received by TPC from an account receivable for example, is value conferred to TPC. These facts alone are sufficient to defeat Defendants’ summary judgment motion on Plaintiffs’ quantum meruit claims. Furthermore, Plaintiffs’ submitted worklogs indicate the existence of a dispute of material fact. Construing the facts most favorably for Plaintiffs, the court must deny Defendants summary judgment on these counts.
IV. GOOD FAITH AND FAIR DEALING CLAIMS (COUNTS VIII AND XVI)
Defendants focus their arguments on Plaintiffs’ statement in the Complaint alleging that TPC breached the covenant of good faith and fair dealing by terminating Plaintiffs “in an effort to avoid its financial obligations in the form of wages, bonuses, and other compensation.” The court finds Defendants’ arguments on this allegation regarding wrongful termination persuasive. However, Plaintiffs also allege in the Complaint that Defendants breached their obligation of good faith and fair dealing by “refusing to compensate [Plaintiffs] for work performed, wages owed and other compensation” (emphasis added). On these grounds, Plaintiffs present sufficient evidence for a reasonable juror to find a breach of the covenant of good faith and fair dealing.
“Every contract implies good faith and fair dealing between the parties to it.” Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991), quoting Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354, 362 n.9 (1990). The covenant is preserved so long as neither party injures the rights of the other to reap the benefits prescribed by the terms of the contract. See Druker v. Roland Wm. Jutras Assocs., Inc., 370 Mass. 383, 385 (1976). However, it is limited in scope and cannot “create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.” Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004). In determining whether a party violated the implied covenant of good faith and fair dealing, we look to the party’s manner of performance. See Hawthorne’s, Inc. v. Warrenton Realty, Inc., 414 Mass. 200, 211 (1993). The plaintiff bears the burden of showing the defendant’s lack of good faith, but is not required to show that the defendant acted in bad faith. Nile v. Nile, 432 Mass. 390, 398-99 (2000). Alack of good faith can be inferred from the totality of the circumstances. Id. at 399.
Here, Defendants concede that they did not pay the January draw due on February 7,2009 to Plaintiffs until several months later. This failure to timely pay owed wages injured Plaintiffs’ right to reap contractual benefits. Plaintiffs have also presented sufficient evidence for a reasonable jury to infer from the totality of the circumstances that Defendants failed to act in good faith in withholding this payment. A reasonable jury could determine that McMillan’s February 6, 2009 email threatening to stop the January draw payment due to his dissatisfaction with Plaintiffs’ January billing, and Hellner’s February 11, 2009 email seemingly conditioning release of the January draw payment on reaching a settlement, support a finding of an absence of good faith. Our courts have long recognized that the employer’s motivations or state of mind is a factual inquiry, making claims of breach of the covenant of good faith and fair dealing especially resilient to summary judgment. See LaBonte v. Hutchins & Wheeler, 424 Mass. 813, 820 (1997), citing Flesner, 410 Mass. at 809 (“where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate”). Here, Plaintiffs have presented sufficient evidence such that a reasonable juror could infer an absence of good faith considering the totality of the circumstances.
Thus, as to Plaintiffs’ good faith and fair dealing claims, the court grants summary judgment to Defendants in part on the grounds of wrongful termination, and denies summary judgment in part on the grounds of failure to pay owed wages.
ORDER
For the foregoing reasons, it is hereby ORDERED that Defendants’ Motion for Summary Judgment is DENIED as to counts VII and XV and DENIED in part as to counts VIII and XVI to the extent that they are based on Defendants withholding payment. Summary judgment is also DENIED in part as to counts IV and XII to the extent that they are based on the late January draw payment. Defendants’ Motion for Summary Judgment is ALLOWED as to all other counts, including the remaining grounds of counts IV and XII not based on the late January draw payment.

The statute provides in pertinent part: “Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him . . . and any employee discharged from such employment shall be paid in full on the day of his discharge . . . The word ‘wages’ shall include any holiday or vacation payments due an employee under an oral or written agreement . . . This section shall apply, so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authortzed deductions, has been definitely determined and has become due and payable to such employee, and commissions so determined and due such employees shall be subject to the provisions of [§150].” G.L.c. 149, §148.