## JOHNNIE F. WEEMS, THIRD *vs.* CITIGROUP INC. & others[1] (and a companion case[2]).

Suffolk. April 8, 2008. - January 30, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Labor;* Wages.

Discussion of the weekly wage act, G. L. c. 149, §§ 148 et seq., and the types of deductions from wages excluded from coverage under the weekly wage act pursuant to G. L. c. 154, § 8. [150-153]

This court concluded that the forfeiture provision in a certain employee stock plan did not violate the weekly wage act, G. L. c. 149, §§ 148 et seq. [153-157]

CERTIFICATION of a question of law to the Supreme Judicial Court by the United States District Court for the District of Massachusetts.

*Justin P. O'Brien* (*Michael A. Collora* with him) for Johnie F. Weems, III, & others.

*Preeta D. Bansal,* of New York (*David S. Clancy & Kara E. Fay* with her) for Citigroup Inc & others.

*Martha Coakley,* Attorney General, & *Karla E. Zarbo,* Assistant Attorney General, for the Commonwealth, amicus curiae, submitted a brief.

---

[1]Salomon Smith Barney Holdings Inc., Salomon Smith Barney Inc., and Travelers Group Inc. (collectively, defendants).

According to the joint statement of facts submitted pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981), Citigroup Inc. (Citigroup) is a corporation organized under Delaware law with New York as its principal place of business. Citigroup was formed in 1998 as a result of a business combination of Travelers Group Inc. and Citicorp. Salomon Smith Barney Inc. and Salomon Smith Barney Holdings Inc. were predecessors to certain Citigroup subsidiaries, namely Citigroup Global Markets Inc. and Citigroup Global Markets Holdings Inc., respectively.

[2]Maxwell Peckler & others *vs.* Citigroup Inc. & others. Johnie F. Weems was not a party to the Massachusetts Superior Court case that was consolidated in the United States District Court with similar actions from other States.

IRELAND, J. A judge of the United States District Court for the District of Massachusetts has certified a question to this court in accordance with S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981). The question arises in connection with consolidated cases, in which the plaintiffs claim, among other things, that a forfeiture provision in an employee stock plan offered by the defendants to their employees, called the Capital Accumulation Plan (CAP), violates the weekly wage act, G. L. c. 149, §§ 148 et seq. (act).[3] One complaint in the underlying action initially was filed in the Superior Court in December, 1999. The defendants removed the case to the Federal District Court in January, 2000. A class was certified in October, 2001.[4]

In July, 2002, a judge in the Federal court denied the parties' cross motions for summary judgment on the count under the act. In July, 2007, a second judge certified the following question to this court: "Does the forfeiture provision of the Citigroup Capital Accumulation Plan violate [the act]?" For the reasons set forth below, we answer the question in the negative.

*Background.* We present the relevant facts as taken from the parties' joint statement of facts and exhibits submitted pursuant to S.J.C. Rule 1:03, § 3 (2).

According to a 1989 prospectus, CAP's purpose is "to attract, retain and motivate officers and other key employees, to compensate them for their contributions to the growth and profits of the [company] and to encourage ownership of the common stock of the [company] on the part of such personnel."[5] Although vari-

---

[3]In addition to alleging a violation of G. L. c. 149, §§ 148 et seq. (act), the plaintiffs challenge the forfeiture provision of the CAP plan based on theories of conversion, constructive trust, breach of fiduciary duty, violation of the covenant of good faith and fair dealing, and unjust enrichment. Those counts are not before us.

[4]The certified class consists of "all former employees of Citigroup, Salomon Smith Barney, Travelers Group Inc., or related and affiliated companies in Massachusetts who participated in the Capital Accumulation Plan of Citigroup Inc., Travelers Group Inc., Travelers Inc., and/or Primerica Corporation who resigned or who were terminated on or after December 3, 1993 and as a consequence lost the right to receive shares of stock and/or options and/or other earned income under the terms of the plan upon termination."

[5]According to the parties, "CAP was initially adopted by Primerica Corporation (which is not a named defendant . . .) in the late-1980s. Following a 1993/1994 business combination of Primerica Corporation and Travelers

ous versions of CAP have existed over the years, there are three basic programs, "payroll," "bonus," and "branch manager." Under each program, participants acquire "restricted" stock (stock), meaning that the sale or transfer of the stock is prohibited until after a specific vesting period.

Participants acquire the stock at a twenty-five per cent discount from its fair market value. Taxes may be deferred on the fair market value of the stock during the vesting period. Participants also are entitled to vote their stock, and to receive any dividends or dividend equivalents during the course of the restricted period. All three programs have a forfeiture provision whereby at any time prior to retirement or death, should an employee voluntarily terminate his employment, or be involuntarily terminated "for cause" (as defined by CAP), the employee forfeits all unvested stock. Moreover, because participants in the payroll program direct part of their cash compensation to purchase the stock, these participants also forfeit the underlying cash that was used to purchase that unvested stock.[6]

The plaintiffs Maxwell Peckler, James P. Pinder, and Avery L. Williams were employed as "financial consultants"[7] for Salomon Smith Barney Inc. (SSB) in Massachusetts. The plaintiff Gary H. Cohen was employed as an SSB branch manager. All participated in CAP and forfeited unvested restricted stock when they voluntarily terminated their employment after December 3, 1993.

---

Corporation (which, prior to the business combination, did not have CAP), CAP was sponsored by the successor entity, named defendant Travelers Group Inc. CAP is now sponsored by named defendant Citigroup, which resulted from a 1998 business combination of Travelers Group Inc. and Citicorp (a then-independent company that did not have CAP)."

[6]We note that terms such as "wages," "compensation," "cash," "deduction," and the like are used in this opinion strictly for purposes of answering the question before us about the act. We have not been asked to determine whether CAP comports with any other law. We do not intend the nomenclature we choose to express a view as to the meaning such terms have under other statutes, such as the Federal tax laws. See note 12, *infra.*

[7]In the context of these cases, financial consultants are stockbrokers. We note that, in their joint statement of facts, the parties have not revealed how financial consultants are paid. From deposition testimony, it appears as though they were paid in commission. The plaintiffs state, in their brief, that financial consultants are paid commissions. As discussed *infra*, the payroll plan also was open to branch managers; they are paid a salary.

The differences among the programs lay in the specific manner and terms of participation.

*Bonus and branch manager programs.* The bonus program applied to employees who received a base salary and annual discretionary incentive bonus. These employees became mandatory participants in CAP, receiving some of their bonus in stock. The total amount of stock awarded was based on the participant's total annual compensation (including, but not limited to, base salary and annual incentive bonus). The stock vested in three years.

The branch manager program was "similar in material respects" to the bonus program except that there were separate documents outlining the branch managers' compensation plan concerning the award of stock bonuses. In addition, branch managers could participate, under certain conditions, in the payroll program.

*Payroll program.* Those who elected to participate in the payroll program, such as Peckler, Pinder, and Williams, were required to sign a form authorizing the defendants to take a portion of their "cash compensation paid . . . during the specified period" and use it to purchase stock. The form allowed the participant to designate a minimum of five per cent of his or her "cash compensation" for the stock, up to a maximum of twenty-five per cent. The document was signed before the period of employment for which the stock was purchased.

The stock purchase was listed as a line item "deduction" on the employee's pay slip, alongside health and dental insurance deductions and payroll tax deductions. The defendant (here, SSB), in turn, used the money to purchase the stock every six months. The stock vested in two years. It is important to note that, if a participant left the employ of the defendant before the defendant's six-month purchase was made, the participant would receive, in cash, the amount that had been deducted for the anticipated stock purchase. Absent participation in the program, an employee would have received, in cash, the amount designated for the purchase of the stock.

*Statutory scheme.* The basic purpose of the act is "to prevent the unreasonable detention of wages." *Boston Police Patrolmen's Ass'n* v. *Boston,* 435 Mass. 718, 720 (2002) (*Boston Police*),

citing *American Mut. Liab. Ins. Co.* v. *Commissioner of Labor & Indus.*, 340 Mass. 144, 147 (1959). To that end, G. L. c. 149, § 148, provides: "[Employers] shall pay weekly or bi-weekly each such employee the wages earned by him . . . [and] any employee leaving his employment shall be paid in full on the following regular pay day, and, in the absence of a regular pay day, on the following Saturday . . . . No person shall by a special contract with an employee or by any other means exempt himself from this section . . . ." An employer who violates the act is subject to possible civil and criminal penalties, injunctive relief, treble damages, and attorney's fees and costs. *Id.* at §§ 27C, 148, 150.

The act expressly states that holiday and vacation pay due under an agreement, as well as commissions that are definitely determined and due and payable to the employee, are wages within the meaning of the act, but it does not otherwise expressly define the term "wages." *Id.* at § 148. Our appellate courts have held that the act does not cover contributions to deferred compensation plans or severance pay. See respectively *Boston Police, supra* at 719-721; *Prozinski* v. *Northeast Real Estate Servs., LLC*, 59 Mass. App. Ct. 599, 605 (2003). With respect to the payment of commissions, this court held in *Wiedmann* v. *Bradford Group, Inc.*, 444 Mass. 698, 708 (2005), that the statutory requirement that commissions be paid when they are "definitely determined" means when they become "arithmetically determinable." In *Okerman* v. *VA Software Corp.*, 69 Mass. App. Ct. 771, 776-779 (2007), the Appeals Court held that commissions earned over and above a base salary were covered by the act; the court declined to limit the reach of the act, where the only limitation contained in the act's language was that commissions be "definitely determined" and "due and payable." Contrast *Commonwealth* v. *Savage*, 31 Mass. App. Ct. 714, 716-718 (1991) (certain real estate commissions were not covered by act, where commissions were episodic and broker functioned as independent contractor).

Notwithstanding the provisions of G. L. c. 149, § 148, however, another statute, G. L. c. 154, § 8, specifically excludes from the coverage of the act certain types of deductions from wages made by an employer at an employee's request, including, among other things, deductions of amounts used to purchase

company stock pursuant to an employee stock purchase plan. General Laws c. 154, § 8, states:

"None of the foregoing sections of this chapter, nor [G. L. c. 149, § 48,] shall be applicable to or control or prohibit the deduction of labor or trade union or craft dues or obligations, or making deposits in, purchasing shares of, or for the repayment of any loan from any credit union established under the laws of the commonwealth or of the United States, or deposits in any savings bank, trust company, national banking association or co-operative bank, or subscriptions to a non-profit hospital service corporation established under [G. L. c. 176A], or to a medical service corporation established under [G. L. c. 176B], or to a charitable corporation, or payments or contributions of or toward the cost of or the premiums on any insurance policy or annuity contract or purchase of government bonds, or *purchase of stock pursuant to an employee stock purchase plan, from wages of an employee by an employer in accordance with a written request made by the individual employee*; provided, that no such written request, whether recorded or not, except in the case of labor or trade union or craft dues, shall be regarded as an assignment valid against a trustee process.

"Whoever fails to send the labor, trade union or craft dues deducted from an employee's wages to the union within fourteen days of the date when the dues have been deducted or are due under the collective bargaining contract, whichever comes later, shall be punished by a fine of not more than one hundred dollars. The employee whose dues have been so deducted or an officer of the union to which the dues have been assigned shall have the right to swear out a complaint for any such violation. No such penalty shall be imposed if the employer has filed a petition in a court of civil jurisdiction for the purpose of determining to whom said union dues are payable. *Any other money deducted from an employee's wages shall be paid* over forthwith, but in no event more than seven business days from the date when the deduction has been made or was due to the employee, *to the person, credit union, bank, insurance company or corporation named by the employee* pursuant to the provisions of this section, *unless there is a*

*prior written agreement between the employer and the recipient named by the employee that provides that payment may be made at some other time or times.*" (Emphases added.)[8]

*Discussion.* The plaintiffs argue that the forfeiture provision of CAP violates the act because it sometimes requires employees to forfeit a portion of their earned wages. They further argue that the agreements signed by them, enrolling them in CAP, are unenforceable under the provision of the act that prohibits "special contracts,"[9] and as a matter of public policy. The defendants respond, in essence, that the restricted stock acquired by an employee under the terms of CAP is "contingent compensation," and not "wages" subject to the act.

"Statutory interpretation is a question of law for the court . . . . [W]e interpret the statutory language 'according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.' " *Boston Police, supra* at 719-720, quoting *Champagne v. Champagne,* 429 Mass. 324, 326 (1999), and cases cited.

We begin by addressing CAP's bonus program and branch manager program. The parties agree that the bonuses awarded to employees eligible under the bonus program are "discretionary." They also appear to agree that awards of stock under the branch manager program are discretionary. With respect to the branch manager program, they state that bonuses are "*potentially* awarded in part in the form of an award of restricted stock." The plaintiffs assert that labels such as "bonus" are not binding on the court for purposes of determining whether some types of compensation constitute "wages" under the act, see generally, *Wiedmann v. Bradford Group, Inc., supra* at 703-704, but that point misses the mark. The operative fact here is that bonus awards under these programs are discretionary, not be-

---

[8]The parties have not provided, and we have not found, any legislative history for this statute.

[9]Because of our conclusion that the stock programs at issue here do not constitute wages under the act, the special contract provision does not apply.

cause they are labeled bonuses, but because the employers are, apparently, under no obligation to award them. See generally *Weems* v. *Citigroup, Inc.,* 289 Conn. 769, 778, 782 (2008) (under CAP plan, bonus and branch manager programs do not constitute wages under Connecticut's wage laws and are purely discretionary). Moreover, it is clear from the governing documents supplied by the parties that the awards of stock under these programs were awards of *restricted* stock. In other words, this part of the compensation for participants in the bonus and branch manager programs was not only discretionary, but it also had an important contingency attached to it: an employee who received such an award would receive the full benefit of the stock (i.e., the restriction would be lifted and the stock would vest fully) only if the employee remained with the company for the defined period after the award. The only thing they "earned" as a result of their bonus was stock that had limited value to them until it vested. See generally *Harrison* v. *NetCentric Corp.,* 433 Mass. 465, 466, 473 (2001) ("The defendants did not deprive the plaintiff of any income that he reasonably earned or to which he was entitled. His shares [of stock] vested over time only if he continued to be employed; thus, the unvested shares are not earned compensation for past services, but compensation contingent on his continued employment").[10]

As discussed, the payroll program involves terms and conditions that differ from the bonus program and the branch manager program. We preface our analysis of the payroll program by stating that we recognize that there are factual disputes that have yet to be resolved in the trial court. For example, although the plaintiffs in the payroll program admit that they signed

[10]We reject the plaintiffs' argument that we should adopt a broad definition of wages in this situation. *Jancey* v. *School Comm. of Everett,* 421 Mass. 482, 490-492 (1995), *S.C.,* 427 Mass. 603 (1998), on which they rely for this proposition, is distinguishable. In the *Jancey* case, the court defined "wages" under the Equal Pay Act, a remedial statute that requires an assessment of all potential sources of "pay" in order to ensure equality of total compensation. *Id.* at 493 (narrow interpretation of wages in context of Equal Pay Act would allow some employers to evade statute, by compensating men and women at same hourly rate but offering men greater benefits). The weekly wage act, in contrast, is designed to prevent the unreasonable detention of earned wages. The question here is not how broadly to define wages, but rather, as we discuss *infra,* what earned wages are within the meaning of the act.

documents to enroll in CAP, they claim that their participation was not voluntary, i.e., that they were pressured, and essentially required, to participate by their superiors. They also contend that the benefits the participants received were illusory, and that the terms and conditions imposed by the defendants on CAP participants were not required, as the defendants maintain, in order for CAP to qualify as a tax deferred plan under Federal tax law. It is not this court's role to engage in the fact finding needed to resolve these allegations. Rather, we shall answer the question certified to us by assuming that participation in the payroll program was voluntary.[11] We shall further assume for purposes of answering the certified question that the benefits conferred by CAP on those who chose to participate were real in an economic sense, and not illusory, and that CAP is designed to comply with the provisions of Federal tax law that require some element of forfeiture for tax deferred plans.[12]

We conclude that the payroll program of CAP is not governed by the act, because it is, in its essence, an employee stock purchase program. Rather, by operation of G. L. c. 154, § 8, the act is inapplicable here. Consistent with the language of G. L. c. 154, § 8, payroll program participants, when they enrolled in the program, effectively requested in writing that a designated percentage of their cash compensation be applied to the purchase

---

[11]The United States Court of Appeals for the First Circuit has recently affirmed the dismissal of contract and State common-law claims, brought under Florida and Georgia law, challenging CAP's forfeiture provision. *In re Citigroup, Inc.*, 535 F.3d 45 (1st Cir. 2008). The plaintiffs in that case are part of the multi-district litigation from which the cases before us arise. The court held that the forfeiture provisions of CAP are "unambiguous" and "enforceable." *Id.* at 48. The court also held in that case that participation in the payroll program was entirely voluntary. *Id.* at 49.

[12]The defendants claim that the forfeiture provision is necessary to comport with the requirements of the Federal tax code. See *Rosen* v. *Smith Barney, Inc.*, 195 N.J. 423, 425-426 (2008) (discussing 26 U.S.C. § 83[a][1] and [c][1] requiring substantial risk of forfeiture for deferred taxes on income); Y.D. Tauber & D.R. Levy, Executive Compensation 77, 83 (2002) (discussing tax implications of restricted stocks under 26 U.S.C. § 83). See also B. Overton & S.E. Stoffer, Executive Compensation Answer Book Q 10:68 (2008) (discussing restricted stock as part of executive compensation); M.S. Sirken & L.K. Cagney, Executive Compensation §§ 5:04[1]-5:04[2] (2008) (discussing restricted stock and tax implications).

of company stocks.[13] See generally *Weems* v. *Citigroup, Inc.,* *supra* at 786-794 (Connecticut statute authorizing deductions from employee wages covered deductions for CAP's payroll plan).

In its amicus brief, the Attorney General argues[14] that G. L. c. 154, § 8, "merely extends the time limits ordinarily required for employers to make payment under the Wage Act," and that the act itself limits defenses available for failure to pay commissions and the list does not include G. L. c. 154, § 8. We agree with the defendants that this provision of G. L. c. 154, § 8, applies to the timing of payments of deductions to third parties.[15] We also note that, under CAP, if an employee leaves a defendant's employ before the stock for which deductions have been made has been acquired, the employee would receive a

---

[13]A representative version of the enrollment document stated, in pertinent part: "I elect to participate in [CAP] subject to all of the provisions and administrative rules of [CAP] and I acknowledge that I have received and read the CAP prospectus which accompanied this form. I hereby irrevocably direct my employer, Smith Barney, to pay me the percent indicated below in the form of restricted stock out of all cash compensation paid to me during the specified period. I understand that if I leave Smith Barney voluntarily or am terminated with [c]ause before the restrictions lapse on these shares of restricted stock received under [CAP], I will forfeit the stock as well as the money I am hereby authorizing to be paid in the form of such restricted stock. I further understand that my election to participate now obligates me to be a participant in CAP during the full year. . . ." The enrolling employee then designated a specific percentage of his or her total compensation to be received in the form of restricted stock.

[14]We invited the fair labor division of the office of the Attorney General to file an amicus brief addressing the certified question, to which the defendants have responded. See G. L. c. 149, § 150 (authorizing Attorney General to enforce act).

[15]As discussed, G. L. c. 154, § 8, second par., states in pertinent part:

"Whoever fails to send the labor, trade union or craft dues deducted from an employee's wages to the union within fourteen days . . . shall be punished by a fine . . . . *Any other money deducted from an employee's wages shall be paid* over forthwith, but in no event more than seven business days from the date when the deduction has been made or was due to the employee, *to the person, credit union, bank, insurance company or corporation named by the employee* pursuant to the provisions of this section, *unless there is a prior written agreement between the employer and the recipient named by the employee that provides that payment may be made at some other time or times"* (emphasis added).

cash refund of the amount that had been designated for the (unfulfilled) purchase. It is only after the stock has actually been awarded to the employee at the various six-month intervals that the cash used for the purchase (and the stock itself) can be "forfeited."

We disagree with the Attorney General's reading of the act and G. L. c. 154, § 8, to conclude that the limited defenses under the act are applicable to the forfeiture of stock purchases. Employee stock purchase plans are explicitly excluded from the act. Defenses to the act are thus immaterial. See *Massachusetts Bay Transp. Auth.* v. *Massachusetts Bay Transp. Auth. Retirement Bd.*, 397 Mass. 734, 738 (1986) (where language of statute plain, there is no room for speculation as to its meaning). See also *Ciardi* v. *F. Hoffmann-LaRoche, Ltd.*, 436 Mass. 53, 62 (2002) (statutes addressing same subject matter should be construed as harmonious whole). Likewise, because G. L. c. 154, § 8, excludes employee stock plans from the act's purview, we cannot adopt the plaintiffs' argument that, as a matter of public policy, we should find that forfeiture is forbidden by the act.

*Conclusion.* For the reasons set forth above, we answer "no" to the certified question. As discussed, our conclusion that CAP's forfeiture provision in the payroll program does not violate the act is qualified by our assumptions that, as a matter of fact, the participation in the payroll program was voluntary and that the benefits conferred by CAP's programs were not illusory.

The Reporter of Decisions is to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of this court, to the Clerk of the United States District Court for the District of Massachusetts as the answer to the question certified, and will also transmit a copy to each party.