Leibensperger, Edward P., J.
Plaintiff Gregory S. Boesel was a founder and former CEO of Swaptree, Inc., a corporation that facilitated online trades of consumer goods (mostly electronics). The individual defendants, Jeffrey Bennett, Daniel Curtis, Erik Rasmussen, Mark Mitchell, and Marty Cagan, were all directors and/or executives of Swaptree (Bennett served as Swaptree’s CEO, Curtis served as CFO, while Rasmussen, Mitchell, and Cagan formed Swaptree’s Compensation Committee of the board of directors). Boesel moves for summary judgment in his favor on Count I of the complaint asserting claims against the individual defendants under the Massachusetts Wage Act, G.L.c. 149, §148. The individual defendants submit a cross motion for summary judgment to dismiss Count I (the Wage Act), Count IV (Breach of Fiduciary Duty/Shareholder Freeze Out) and Count v. (Intentional Interference with Contractual Relations).[2] For the following reasons, Boesel’s motion is DENIED. Defendants’ cross motion is ALLOWED in part and DENIED in part.
BACKGROUND
The following facts are drawn from the parties’joint statement of undisputed material facts. Boesel was a founder of Swaptree and served as the company’s CEO from its founding in 2004 until March 15, 2010. At that time, as part of an investment agreement with a venture capital firm, Boesel resigned from the position of CEO and was replaced by Bennett. Boesel considered leaving the company, but after extended negotiations remained as a board member, stockholder and employee of Swaptree. He accepted the position of President of the company. Boesel entered into an Amended & Restated Employment Agreement (the “Agreement”) dated March 15, 2010, with respect to his new position. The Agreement provided for one year of employment with automatic, annual, renewal unless either party provided sixty days notice of an intention to terminate the Agreement. Boesel worked under this Agreement for two years before it was ultimately terminated on March 15, 2012. At issue in this dispute is the compensation package provided by this Agreement, as well as actions taken by defendants with respect to Boesel.
In addition to health and retirement benefits which are not at issue here, the Agreement provided the following compensation for Boesel. Under §2.01 (A) Boesel was to receive a “Base Salary” of “$14,583.33 per month ($175,000 on an annualized basis)” to be paid “in accordance with the customary payroll practices of Swaptree.” Under §2.01(B), Boesel was eligible to receive bonuses. The first bonus was a mandatory “Annual Bonus” of $25,000 (“During the Term, Executive shall be [sic] receive an ‘Annual Bonus’ of $25,000 per year”). The second bonus was a “Discre *556 tionary Bonus” of up to $100,000 based upon achievement of performance goals set by the CEO. Both bonuses “shall each be payable at the same time as such bonuses for the CEO are payable.” Boesel was also to receive paid vacation “in accordance with Swaptree’s policies with respect to such vacation . . . in effect from time to time.”
Boesel was paid the $175,000 Base Salary in biweekly payments from March 15, 2010 through March 15,2012. He was not, however, paid the Annual Bonus of $25,000 in February 2011, when Bennett and other senior executives received their bonuses. Boesel also did not receive a Discretionary Bonus for 2010.
Boesel questioned Swaptree’s Chief Financial Officer (Curtis) about the bonus payments several times during the spring and summer of 2011. Swaptree’s Compensation Committee reviewed the matter and informed Boesel that he had failed to meet performance goals and would not receive the Discretionary Bonus. Boesel objected, and also noted that the Agreement neither set, nor required, any performance goals for entitlement to the $25,000 Annual Bonus. This dispute continued for several months. On November 8, 2011, Boesel wrote to Bennett proposing a separation from the company upon terms that would include immediate payment of the 2010 Annual Bonus, a pro-rated amount of the 2011 Annual Bonus, plus a Discretionary Bonus for 2010. After receiving an unsatisfactory response to his letter (Bennett allegedly acknowledged that Swaptree owed Boesel the 2010 Annual Bonus, but said that he needed to talk to the board to decide how to proceed), Boesel then initiated, on November 22, 2011, a complaint to the Attorney General’s office under the Massachusetts Wage Act (G.L.c. 149, §148) concerning the non-payment of the 2010 Annual Bonus. The Attorney General’s office granted Boesel permission to pursue a claim in Superior Court, whereupon Boesel sent a second demand letter to the board of directors on December 9, 2011. After not receiving a satisfactory response, Boesel filed this action on December 13, 2011.
While Boesel was in the process of filing this suit, Swaptree initiated an electronic fund transfer to pay the $25,000 Annual Bonus for 2010 (less taxes and other withholdings) on December 12, 2011. Boesel’s bank credited his account with this payment on December 13, 2011.
Boesel continued to work at Swaptree throughout this dispute until he was informed, on January 11, 2012, that his employment would not be renewed after March 15, 2012. Boesel received payment of the 2011 Annual Bonus of $25,000 on March 1, 2012. The CEO of Swaptree, Bennett, received no payment of bonuses for 2011. Some other Swaptree executives received payment of bonuses for 2011 on February 15, 2012.
The parties agree that the Swaptree policy for vacation for executives like Boesel was four weeks per year. Boesel contends that he took only two weeks of vacation during his first year under the Agreement and another two weeks in 2011 during the second year. Defendants contend that Boesel took four weeks in each year. Boesel offers emails exchanges confirming scheduled vacation time, supporting his contention that he took only two weeks of vacation per year. Defendants aver that Boesel took additional vacation time that was not documented by emails. Boesel did not receive any payment for unused vacation.
The Agreement provides that Boesel “shall devote Executive’s full business time, attention, skill and efforts to the business and affairs of [Swaptree].” Boesel concedes that he received financial compensation for outside professional work during the term of the Agreement, specifically software development for a third party. Boesel avers that he worked approximately sixty to seventy hours on this outside project during the two-year period at issue. Boesel further avers that all of this work was conducted during his private time, on nights and weekends, and that none of this work was performed at Swaptree’s facilities or on Swaptree’s equipment.
Swaptree suffered financial difficulties throughout 2011 and 2012. The company ultimately sold substantially all of its assets in September 2012. Boesel contends that he was cut out of the corporate decision-making process during this period and that his shareholder equity in Swaptree was wiped out.
DISCUSSION
I. Summary Judgment
Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Com, 390 Mass. 419, 422 (1983). The moving parly bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence negating an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Tech. Communications Corp., 410 Mass. 805, 809 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. Pederson, 404 Mass, at 17. An adverse party cannot defeat a motion for summary judgment merely by resting on its pleadings and assertions of disputed facts, rather it must set forth specific facts with affidavits, deposition testimony, answers to interrogatories, or admissions on file showing that there is a genuine issue for trial. Mass.RCiv.P. 56(c). When deciding a motion for summary judgment, the court views the evidence in the light most favorable *557 to the nonmoving party, but does not weigh evidence, assess credibility, or find facts. Attorney Gen, v. Bailey, 386 Mass. 367, 370-71 (1982). Where, as here, the court is presented with cross motions for summary judgment, the standard of review is identical for both motions, and the fact that one motion fails does not mean that the cross motion necessarily succeeds. Epstein v. Board of Appeals of Boston, 77 Mass.App.Ct. 752, 756 (2010).
II. Wage Act Claims
The Wage Act, G.L.c. 149, §148, requires employers to pay employees all earned wages on a weekly or bi-weekly basis.[3] Massachusetts courts generally recognize that the purpose of this statute is to prevent the unreasonable detention of earned wages by employers. Weems v. Citigroup, Inc., 453 Mass. 147, 150 (2009). The Wage Act does not, however, define the term “wages.” Thus, courts have considered various kinds of compensation to determine whether the compensation should be held to be a “wage” under the Act. “Our appellate courts have held that the act does not cover contributions to deferred compensation plans or severance pay.” Id. at 151. Moreover, a bonus that is discretionary or contingent upon the employee remaining with the company for a defined period of time has been held not to be a wage under the Act. Id. at 153-54, citing Harrison v. Net Centric Corp., 433 Mass. 465, 466, 473 (2001) (compensation that vests over time is not earned until contingency of continued employment is met); see also Sheedy v. Lehman Bros. Holdings, Inc., 2011 U.S.Dist. LEXIS 131003 (D.Mass. 2011) (where retention of payment was contingent upon continued employment, payment was not a “wage” under the Act). Pursuant to the statute, the word “wage” does include vacation payments due under an oral or written agreement.
Boesel asserts that defendants violated the Wage Act in three ways. They failed (i) timely to pay the 2010 Annual Bonus, (ii) timely to pay the 2011 Annual Bonus, and (iii) to pay accrued but unused vacation time.[4]
A. The Annual Bonus
Boesel contends that the Annual Bonus was non-discretionaiy under the terms of the Agreement. Moreover, he argues that the Annual Bonus was earned throughout the year and was payable on a pro rata basis for any part of a year worked. Thus, he seeks under the Act treble damages, plus costs and attorneys fees, for the delayed payment. Defendants dispute the characterization of the Annual Bonus as an earned wage. They argue that payment of the Annual Bonus was contingent upon Boesel’s continued employment to the end of the calendar year and is, therefore, a typical contingent bonus designed to provide an incentive to an employee to stay employed with the company. Accordingly, they say that the Annual Bonus was not a “wage” under the Wage Act.[5]
Boesel, on the other hand, points to evidence regarding pre-Agreement communications and alleged agreements that he says demonstrate that the Annual Bonus was both non-discretionaiy and non-contingent. Such evidence may not be considered, however, for two reasons. First, the Agreement has an express integration clause stating that it “contains the entire agreement of the parties with respect to the terms and conditions of Executive’s employment. . . and supersedes any and all prior agreements and understandings . . . This Agreement may not be changed or modified except by instrument in writing signed by Swaptree and Executive.” Agreement, §5.03. Second, when a contract is clear and unambiguous, the parol evidence rule bars admission of extrinsic evidence. Siebe, Inc. v. Louis M. Gerson Co., Inc., 74 Mass.App.Ct. 544, 550 (2009).
I look to the terms of the Agreement to determine whether the Annual Bonus is a “wage.” I find that the Agreement is clear and unambiguous. The language regarding Boesel’s compensation package should be given its plain, ordinaiy and usual meaning. Id. at 549. Moreover, the record reflects that Boesel was represented by counsel throughout the negotiation and execution of the Agreement. Boesel testified that he read and understood the final, written Agreement. Finally, to the extent Boesel argues that the pre-Agreement communications suggest that the Annual Bonus was intended to be part of his salary, his argument reinforces the conclusion to look at the final and formal Agreement. An agreement to simply delay payment of a portion ($25,000) of Boesel’s salaiy would be a per se violation of the Wage Act. Thus, there was good reason for the drafters of the formal Agreement to avoid such a violation and to make the payment of the Annual Bonus contingent upon continued employment.
The Agreement clearly distinguishes the Annual Bonus from Base Salary. They are in separate paragraphs and contain different terms with respect to when the amounts are “payable.” While Base Salary is payable monthly in accordance with the company’s customary payroll practices, the Annual Bonus is payable only on the single date the Discretionary Bonus, if any, would be paid—when the CEO receives his bonus. That date, according to the CEO’s employment agreement, was after the calendar year ended— February 15, 2011.[6] The word “Annual” further describes that the Annual Bonus was to be paid once based upon a full year’s employment. While the Annual Bonus in this case did not reserve discretion to the company as to whether Boesel had achieved performance goals, the plain language describing the bonus as “Annual” means that the payment of the bonus was contingent upon Boesel earning it by continuing employment for the full calendar year.
The provisions in the Agreement regarding the employer’s obligations to make payments to Boesel *558 upon termination of employment reinforce the conclusion that the Annual Bonus was not earned on a pro rata basis. Section 4.02 of the Agreement describes the various ways Boesel’s employment could terminate (death, disability, termination for cause, termination without cause, expiration of term, etc.). For only one of the possible ways that Boesel’s employment could terminate—termination by the employer without cause or termination by Boesel for good reason (a defined term)—did the parties expressly agree that Boesel would be paid “a ratable portion of the Annual bonus [sic].” Agreement §4.02(E). For all of the other ways that Boesel’s employment might end, including expiration of the stated term of employment, the language about “ratable portion” is not there. Instead, the Agreement provides that upon such other terminations Boesel will receive upon such termination the amount of the Annual Bonus that has been earned but not yet paid. See §4.02, Expiration ofTerm; Mutual Agreement. In other words, if the Annual Bonus was earned by completion of employment for the previous calendar year, but not yet paid, Boesel was entitled to receive payment upon termination. Reading the contract as a whole, it is clear the parties knew how to express an intention for the Annual Bonus to be earned ratably through the year. Where such an intention was not expressed, the only reasonable inference is that the parties did not intend to have the Annual Bonus earned other than by completion of employment for the year.[7]
The word “bonus,” as is commonly understood, is “something in addition to or in excess of the ordinary or usual amount.” Webster’s II New College Dictionary (1999). The use of “stay in place” or “in your seat” bonuses is a matter of common understanding. Businesses regularly provide a bonus incentive to employees to stay with the company until the bonus is earned or paid. Boesel’s argument would make all such bonus arrangements (if not subject to the employer’s discretion on performance grounds) a violation of the Wage Act. Giving the words “Annual Bonus” their natural meaning, such a bonus is not a “wage” so long as there is some contingency attached to the company’s obligation to pay. Here, under the Agreement, the contingency is that Boesel remain employed by Swaptree throughout the calendar year. Thus, the Annual Bonus under the Agreement was not a “wage” under the Act.
This conclusion is supported by persuasive authority. The First Circuit recently found that a bonus with the contingency of continued employment was not a “wage” under the Act. See Weiss v. DHL Express, Inc., United States Court of Appeals for the First Circuit, No. 12-1853; slip. op. at 18 (June 3, 2013) (the bonus was never earned because contingency did not occur). The court in Weiss explicitly relied upon the Supreme Judicial Court’s opinion in Weems, supra. See also Sheedy, 2011 U.S.Dist. LEXIS 131003. Given this authority, I find that Boesel’s claim in Count I for violation of the Wage Act must be dismissed to the extent the claim relates to late payment of the 2010 and 2011 Annual Bonus.
B. Vacation Pay
As described above, the Wage Act explicitly defines vacation pay as a wage. G.L.c. 149, §148. On this issue, however, the parties vigorously dispute the facts as to whether Boesel is entitled to payment for unused vacation. First, the parties dispute what the company’s policy was with respect to vacation days. Was it “use it or lose it” or did unused vacation days accrue to be paid for by the company when an employee’s employment terminates? Second, the parties vigorously dispute whether Boesel actually utilized all of his vacation days such that no unused vacation accrued. Accordingly, there are genuine disputes of fact such that summary judgment for either party on this Wage Act claim must be denied.[8]
C. Liability of Certain Individuals
Under the Act, “(t]he president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers” of the employees. G.L.c. 149, §148. Thus, an individual who fits the statutoiy definition may be held liable for damages, including treble damages and attorneys fees.
Defendants argue that the three outside directors of Swaptree (defendants Cagan, Mitchell and Rasmussen) are not officers or agents of Swaptree responsible for management. They also argue that Curtis, an allegedly part-time CFO, did not have responsibilities functionally equivalent to those performed by a corporate president or treasurer. If their arguments are accepted, only Bennett, as CEO, could have liability for the Wage Act claim. I analyze this issue having in mind that the only remaining Wage Act claim is the one for vacation pay—an issue dealing more with the day-to-day practices of Swaptree than with corporate policy.
I agree with defendants that the outside directors of Swaptree are not “employers” under the Act. First, a person must be an “officer or agent” of the corporation as required by the Act. Here, the three outside directors were not officers or otherwise employed by Swaptree. Moreover, under common law, an outside director of a corporation is not, per se, an agent of the corporation. Bisson v. Ptech, Inc., 18 Mass. L. Rptr. 417, 2004 WL 2434638 (Mass.Super. 2004) (Gants, J.); see also, Restatement (Third) of Agency, §1.01, Comment f(2) (2006). Boesel cites no authority to the contraiy.[9] Finally, the Supreme Judicial Court in Wiedmann u. The Bradford Group, Inc., 444 Mass. 698, 711 (2005), interpreted the language of the Act as requiring, in addition to being an officer or agent of the corporation, that the individual be “someone who controls, directs, and participates to a substantial degree in formulating and determining policy of a corporation.” The summary judgment record fails to *559 raise a triable fact as to whether Swaptree’s outside directors participated to the substantial degree necessary to make them responsible for the company’s decision regarding vacation pay. Summary judgment will be granted to Cagan, Mitchell and Rasmussen on Boesel’s Count I for violation of the Wage Act.
Curtis, as CFO, qualifies as an “officer” of Swaptree. I find that there are genuine issues of fact as to the scope of his responsibilities, particularly with respect to the decisions regarding vacation pay, that prevent summary judgment in his favor. His cross motion for summary judgment on the Wage Act claim will be denied.
II. Minority Shareholder Freeze-Out
Defendants move for summary judgment on Count IV, Boesel’s breach of fiduciary duly and corporate freeze-out claim. Massachusetts law provides that the law of the state of incorporation is controlling with respect to matters of internal corporate governance, such as matters peculiar to the relationship among or between the corporation and its officers, directors and shareholders. Harrison v. Netcentric Corp., 433 Mass. 465, 471 (2001). As alleged by Boesel, Swaptree is a Delaware corporation. Thus, the court will apply substantive Delaware law when considering this claim.
The sum and substance of Boesel’s claim of “freeze-out” is that he was essentially disregarded as president of the company after the execution of the Agreement. He says he was “marginalized” by Bennett and cut out of “almost all” corporate decision making. He alleges that he was not told of an all-company meeting and that he was not provided with documents or materials provided to other board members prior to board meetings. Boesel does not assert that he was excluded from board meetings. In fact, as a member of the board he regularly attended board meetings. Most importantly, Boesel admits that “(n]o conduct by the defendants denied him rights as a stockholder or affected him differently from other common stockholders.” Statement of Facts, ¶155.
Under Delaware law, majority stockholders may not be held liable for breach of fiduciary duty with respect to issues involving the employment of a minority stockholder when there is an employment contract. RibletProducts Corp. v. Nagy, 683 A.2d 37,39-40 (Del. 1996). The summary judgment record, including Boesel’s Supplemental Affidavit, simply does not raise any substantial issue of breach of fiduciary duty to Boesel as a stockholder. The Agreement gave the company the right to terminate the employment of Boesel and, as described above, governed what compensation was owed to Boesel. Fiduciary duty did not require that the other board members and stockholders agree with or listen to whatever management suggestions Boesel offered, or hypothetically would have offered, while he remained employed. To the extent that Boesel alleges that he received board materials late, that complaint was remedied by a court order early in this case. The initial failure to provide timely board materials does not rise to the level of a breach of fiduciary duly under these circumstances. Accordingly, Count IV of Boesel’s complaint will be dismissed.[10]
III. Intentional Interference with Contractual Relations
Defendants also move for summary judgment on Count v. of the complaint, in which Boesel alleges, in substance, that defendants declined to set performance goals under Boesel’s employment Agreement for the sole purpose of denying him the opportunity to earn the Discretionary Bonus. Boesel alleges that defendants actions were “improper in means and motive.”
The Supreme Judicial Court has established that claims of intentional interference with advantageous relations against corporate officials must satisfy a high burden. Blackstone v. Cashman, 448 Mass. 255, 261 (2007). The same principles apply to the tort of interference with contractual relations. Id. at 260, n.9. This heightened burden requires a plaintiff/employee to prove “actual malice” whenever such a claim is brought against a corporate official for actions taken on behalf of a corporation/employer. Id. The term of art “actual malice” is defined as “a spiteful, malignant purpose, unrelated to the legitimate corporate interest.” Id. (internal quotations omitted).
With respect to 2011, the board, including Boesel, voted unanimously not to award any discretionary bonuses. Accordingly, Boesel’s claim of interference can only relate to the decision not to award a discretionary bonus to him for 2010.
Defendants assert that the board’s decision whether to award Boesel with a discretionary bonus in 2010 was based on their assessment of all eligible employees’ performance and the need to provide incentives for the next year. The board decided not to award Boesel a discretionary bonus. Boesel, on the other hand, points to the unjustified delay of nearly ten months by defendants to pay Boesel’s 2010 Annual Bonus. In addition, he alleges that Bennett refused to set performance goals for Boesel that could form the basis of the discretionary bonus.
The determination of a defendant’s state of mind is usually a question of fact to be determined by the jury. There are sufficient disputed facts in the record, particularly the reasons for failing timely to pay the 2010 Annual Bonus, to raise a triable issue as to whether defendants’ acted with malice towards Boesel. Defendants’ motion for summary judgment on Count v. will be denied.
ORDER
For the reasons set forth above, plaintiff Gregory Boesel’s motion for partial summary judgment is DENIED. The motion of defendants Erik Rasmussen, Mark Mitchell, and Marty Cagan for summary judg *560 ment on Count I is ALLOWED. The motion of Bennett and Curtis for summary judgment on Count I is DENIED with respect to the Wage Act claim for unpaid vacation only. Defendants’ motion for summary judgment on Count IV is ALLOWED and on Count v. is DENIED.

By previous Order, the claims against Swaptree were dismissed without prejudice as subject to an agreement to arbitrate. Counts II and III of the Second Amended Complaint were against Swaptree, only.

Nile Wage Act includes some exceptions to this general requirement, e.g., executive and professional employees may request payment on a monthly basis.

No the extent Boesel’s claim in Count I is that failure to pay the Discretionary Bonus was a violation of the Wage Act, such claim fails for the same reason that the claim regarding the Annual Bonus fails. A discretionary bonus is not a “wage” under the Act.

Defendants do not dispute that any damages from the late payment of the 2010 Annual Bonus could be pursued in arbitration as a breach of contract by Swaptree.

It is worth noting that the CEO’s Annual Bonus was different that Boesel’s. In the CEO’s agreement, it was explicitly stated that the CEO’s Annual Bonus of $75,000 “shall be deemed earned in an amount of $6,250 per month of the year ended December 31, 2010.” The CEO’s agreement, also dated March 15, 2010, was signed by Boesel, in his capacity as president of the company. Thus, both parties knew how to express an intention to have the Annual Bonus be earned on a pro rata basis. Boesel’s Agreement does not have this language.

Boesel points out that under Section 4.02(A) and (B), termination by death or disability, respectively, the Agreement provides that Annual Bonus will be paid “to the extent earned, but not paid." That difference in language from Section 4.02(D) does not suggest a different result.

defendants also argue that Boesel should be barred, as a matter of law, from pursuing the Wage Act claim for unpaid vacation because he admittedly worked 60 to 70 hours for other companies during the two-year period of employment with Swaptree. Defendants cite no authority for why an alleged breach of contract by Boesel would give the individual defendants immunity from liability under the Wage Act. This defense is rejected.

As then-Superior Court Justice Gants noted in Bisson, it is difficult to believe that the Legislature intended to include an outside director, acting solely as an outside director, as a person liable under the Wage Act. Such potential exposure to liability would likely have a significant effect on the ability of companies to recruit experienced and competent outside directors.

A Massachusetts Appeals Court rescript decision, applying Delaware law, allowed a freeze-out claim connected to an employment agreement to survive a motion to dismiss. Clemmerv. Cullinane, 62 Mass.App.Ct. 904 (2004). The court recognized that a breach of fiduciary duty claim might exist where there is a wrongful freeze-out of a minority stockholder’s stock interest. Here, on the summary judgment record, there was no such freeze-out.