NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1372

WILLIAM J. SULLIVAN

vs.

PEOPLESBANK & others.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, William J. Sullivan, appeals from a grant of summary judgment to the defendants, PeoplesBank, Thomas W. Senecal, and Brian Canina (collectively, the bank). Sullivan worked at PeoplesBank through the year 2020; he resigned in January of 2021. Sullivan claims that he is entitled to a variable compensation award of $40,735 for his work in the year 2020. The bank refused to pay the variable compensation award, because the bank contends that payment of its variable compensation awards was discretionary, and in any event was conditioned on the recipient (Sullivan) being an active employee

---

[1] Thomas W. Senecal and Brian Canina.

at the time of the award's payout, which did not occur until February of 2021, after Sullivan had resigned.

Sullivan consequently brought this action, claiming that (1) the bank's failure to pay the variable compensation award violated the Wage Act, G. L. c. 149, § 148, and (2) the bank breached the terms of Sullivan's employment contract and breached the contract's implied covenant of good faith and fair dealing. For the reasons herein, we affirm the motion judge's conclusions that the variable compensation award did not constitute "wages" under the Wage Act, and that the bank did not breach any contractual obligation to Sullivan.

Background. On June 23, 2004, the bank offered Sullivan a position as vice president of commercial lending. In addition to identifying Sullivan's salary and benefits, the offer letter stated that there was a "potential" for Sullivan to receive a "performance based variable compensation package." Sullivan accepted the offer and started his employment in August of 2004. Thereafter, Sullivan received such a variable compensation payment, in addition to his base salary, during each year of his employment from 2004 to 2019.

On January 4, 2021, Sullivan submitted his letter of resignation. That same day, Sullivan had an exit interview with a member of the bank's human resources department, during which Sullivan asked about receiving his variable compensation award

for 2020. Sullivan was advised that because he was resigning before the date on which the variable compensation awards were scheduled to be paid, he would not receive the award for 2020. In a follow-up conversation, Sullivan was told that to be eligible for payment, he had to be employed by the bank on the date the payments were issued to all employees.

The terms of the bank's short-term variable compensation plan (STVCP) are set forth in a "Summary Plan Document" (plan document), which is maintained by the bank's human resources department. The plan document was provided, and addressed, during discovery. Although Sullivan complains that the document was not provided to him prior to or during his employment, Sullivan does not dispute (1) the authenticity of the document, nor (2) that the document was available to bank employees, including Sullivan, upon request.[2] The document confirms that the STVCP is "part of a total compensation package" for bank employees, and also sets forth the bases for calculating the amount of the award. Importantly for present purposes, however,

---

[2] At oral argument, Sullivan's counsel sought to dispute the plan document's availability by arguing that Sullivan was not aware of the document until after his resignation. This argument is unavailing. The fact that Sullivan was unaware of the plan document's existence does not contradict the otherwise undisputed evidence that the document did in fact exist at the time of Sullivan's resignation, and was accessible to him upon request. Put differently, Sullivan could have asked about the terms of the plan at any time before resigning, but there is no evidence that he did.

the document states (1) that the award will be paid out within two and one-half months of year end, but that "[a] participant must be 'actively at work' within the Bank at the time of payment in order to receive an incentive award payment," and (2) that the bank's compensation committee "has the discretion to adjust payouts." This discretion is affirmed a second time in the document, where it states that the compensation committee has the "discretion to modify, increase or eliminate [variable compensation] awards [for a given year] based on positive or negative business factors." Finally, the document further states that the STVCP is designed to "[a]ttract and retain talent needed for the Bank's success."

The bank calculates the amount to be paid under the STVCP pursuant to a formula that considers three performance metrics for each year: individual goals, divisional goals, and organizational goals. Each goal has three quantifiable levels of achievement -- threshold, target, and stretch -- that determine whether an employee receives fifty percent, one hundred percent, or 150 percent of the employee's variable compensation figure. The variable compensation figure is a percentage of the employee's salary. Thus, depending on whether the threshold, target, or stretch metric is met for each particular goal, an employee's variable compensation for a given year could amount to as much as twenty-seven percent of the

4

employee's base salary.  Based on the applicable formula, Sullivan would have received a variable compensation award of $40,735 had he remained with the bank until the 2020 payments were made in February of 2021.

Sullivan filed this action in March of 2021, asserting that the variable compensation award constituted "wages" under the Wage Act and that, in any event, the bank had breached its contract by not paying the award.  Both parties moved for summary judgment.  After a hearing, the judge granted summary judgment to the defendants on both claims, reasoning that the variable compensation award was a discretionary bonus, and thus, did not constitute "wages" under the Wage Act.  Sullivan appeals.

Discussion.  We review a grant of summary judgment de novo to determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are no issues of material fact and the moving party is entitled to judgment as a matter of law.  See DeWolfe v. Hingham Ctr., Ltd., 464 Mass. 795, 799 (2013).  See also Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002).

The purpose of the Wage Act is "to prevent the unreasonable detention of wages."  Boston Police Patrolmen's Ass'n v. Boston, 435 Mass. 718, 720 (2002).  The principal question this case presents is whether the once-yearly variable compensation

5

payment at issue constitutes a "wage" under the Wage Act. Although the Wage Act does not define the term "wage," we have construed the term to mean "salary (or more colloquially 'pay'), from an employer to an employee, including . . . certain delineated commissions." O'Connor v. Kadrmas, 96 Mass. App. Ct. 273, 287 (2019), quoting G. L. c. 149, § 148.

Sullivan contends that the variable compensation payment at issue meets the definition of wage because it was "definitely determined" and "due and payable." In so arguing, Sullivan is attempting to tie into the express language of the Wage Act, which states that it applies to the payment of "commissions," "when the amount of such commissions . . . has been definitely determined and has become due and payable." G. L. c. 149, § 148.

There are several flaws in Sullivan's attempt to analogize the variable compensation payment at issue to a "due and payable" "commission." First, the variable compensation payment does not meet the usual conception of a "commission." A commission is generally defined as "compensation . . . set typically as a percentage of the sales price." Suominen v. Goodman Indus. Equities Mgt. Group, LLC, 78 Mass. App. Ct. 723, 738 (2011). In contrast, the variable compensation award represents a percentage of an employee's "base salary," and it is calculated based on the performance of the employee's

6

division and the bank's overall performance, as well as an employee's individual performance.

Second, as a general rule, contingent compensation is not considered a wage under the Wage Act, unless it qualifies as a commission. See Mui v. Massachusetts Port Auth., 478 Mass. 710, 713 (2018) ("The only contingent compensation recognized expressly in the act is commissions"). Thus, courts have regularly concluded that types of contingent compensation that are not commissions are not "wages" for the purposes of the Wage Act. See Nunez v. Syncsort Inc., 496 Mass. 706, 712 (2025) (retention bonuses not considered wages); Mui, supra at 713-714 (accrued, unused sick pay not considered wages); Weems v. Citigroup, Inc., 453 Mass. 147, 153-154 (2009) (discretionary bonuses not considered wages); O'Connor, 96 Mass. App. Ct. at 288 (distributions under stock agreement not considered wages); Prozinski v. Northeast Real Estate Servs., LLC, 59 Mass. App. Ct. 599, 605 (2003) (severance pay not considered wages). Where the contingent, variable compensation award at issue is not a commission, it is not considered a wage.

Third, and equally decisive, Sullivan is simply wrong in characterizing the variable compensation award as "definitely determined" and "due and payable" to him. Under the plain terms of the plan document, the variable compensation award was not due and payable as of the time Sullivan resigned. Sullivan

7

argues that, because the amount he would have been due under the plan was determinable as of December 31, 2020, the award should be treated "on par" with a commission. This argument misses the mark. The plan document is express that payments must be approved by the bank's compensation committee each year, and that the committee has discretion not to make the award.[3] Here, Sullivan resigned before the award was authorized. Moreover, a contingent payment that is subject to the discretion of the employer is not considered a wage, as several courts have held. See Weems, 453 Mass. at 153-154; Weiss v. DHL Express, Inc., 718 F.3d 39, 47 (1st Cir. 2013) (bonus contingent on employee "remaining in good standing" with employer not considered wages). Furthermore, and separately, the variable compensation

---

[3] Sullivan invokes the fact that the variable compensation award has been paid each year that he has worked at the bank, as if that somehow gives him a right to payment that supervenes the terms of the plan document. It does not, as a matter of law, where Sullivan identifies no evidence to dispute the bank's discretion to "modify, increase or eliminate" awards under the plan.

Sullivan also argues, without factual support, that the bank's discretion is limited only to deciding whether awards will be paid in gross for a given year, but does not apply to individual awards. Again, we disagree. There is nothing in the plan document that limits the bank's discretion in approving and making awards under the plan, so such discretion could include denying payments to individual employees or groups of employees. Cf. Jefferson Ins. Co. of N.Y. v. Holyoke, 23 Mass. App. Ct. 472, 475 (1987) ("ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other's").

award was explicitly not payable unless Sullivan remained employed on the payment date. As Sullivan was no longer employed when the payment was authorized and made, Sullivan was not entitled to the award under the express terms of the plan, and thus, the award was never "due and payable" to him.[4]

Our conclusion is buttressed, in particular, by two decisions of the Supreme Judicial Court. In Weems, 453 Mass. at 153-157, the court held that discretionary bonus payments, offered in the form of restricted stock, did not constitute "wages" under the act. Under the terms of the employer's plan, employees who voluntarily terminated their employment forfeited the restricted (and thus, unvested) stock that was awarded through the plan. See id. at 149. The employees argued that the plan's forfeiture component deprived them of "earned wages" under the act, and moreover, that the term "bonus" should not be binding on the court in determining whether compensation was a "wage" under the Wage Act. Id. at 153. In response, the court stated, "The operative fact here is that bonus awards under these programs are discretionary, not because they are labeled bonuses, but because the employers are, apparently, under no obligation to award them." Id. at 153-154. As discussed above, the bank similarly was under no obligation to issue variable

---

[4] The bank approved variable compensation payments for the calendar year of 2020 on January 20, 2021.

compensation awards.  Under the plan document's express terms, the compensation committee, similar to the employer in Weems, retained discretion whether to make the awards, and to whom to make them in a given year.

Likewise, in Nunez, 496 Mass. at 713, the court recently held that retention bonuses -- that is, payments contingent on the employee's continued employment until a specified date, and "not made solely in exchange for the [employee's] labor or services" -- are outside the scope of the Wage Act.[5]  The court concluded that, because such payments are "made in exchange for the plaintiff's agreement not to leave the company before the fixed dates," they thereby constitute contingent, "additional compensation" not covered by the act.  Id. at 712.  Here, the plan document states, in relevant part, that an employee must be an "active associate" to receive the award.  This condition is designed, in part, "[t]o encourage associates to remain in the employment of the Bank . . . ."  Thus, under the terms of the plan's document, the variable compensation award, akin to the bonus in Nunez, compensates employees as an incentive for their continued employment until a defined date, and thus, is not

---

[5] The employer and employee in Nunez entered into a "retention bonus agreement" whereby the employee would receive bonus payments on two specified "retention dates," contingent on the employee's active employment on such dates.  Nunez, 496 Mass. at 707.

10

within the purview of the act.  See id. at 713.

Sullivan relies heavily on the decision of the United States District Court for the District of Massachusetts in Israel vs. Voya Institutional Plan Servs., LLC, U.S. Dist. Ct., No. 15-11914 (D. Mass. Mar. 16, 2017), but that reliance is misplaced.  The Israel decision of course is not binding on this court, but in any event, it is readily distinguishable.  In Israel, the court concluded that payments under an employer's variable compensation plan were commissions, and therefore "wages," under the act.  See id., slip op. at 9-14. Importantly, the compensation in Israel was based primarily on revenue generated exclusively from accounts managed by the employee.  See id. at 9.  In contrast, the variable compensation award here, although based in part on metrics and calculations associated with an employee's individual performance, is based largely on group and company-wide metrics for a given year. Additionally, the compensation in Israel "was paid monthly and constituted a significant portion of [the plaintiff's] monthly pay."  Id. at 14.  Conversely, variable compensation awards -- if they are approved by the bank's compensation committee -- are paid to employees in a lump sum on an annual basis, and calculated based on a percentage of the employee's already-determined, yearly salary.

11

In sum, under the undisputed terms of the plan document, the variable compensation award is not a wage for the purposes of the Wage Act.[6]

Finally, we turn to Sullivan's claim for breach of the implied covenant of good faith and fair dealing. Sullivan argues that the bank's refusal to pay the variable compensation award was a "pretext for punishment" for Sullivan's decision to resign from the bank to join a competitor. Given the circumstances, this argument fails as a matter of law. As noted above, under the terms of the plan document, Sullivan failed to satisfy a condition precedent to receiving the award by resigning before the award was authorized and paid by the bank's compensation committee. Put differently, the plain terms of the plan document dictated that Sullivan had no right to receive the award upon his resignation. Where Sullivan had no contractual rights with respect to the variable compensation plan, there was no breach of the implied covenant of good faith and fair dealing. See Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367,

---

[6] Because we conclude that the variable compensation award did not constitute "wages" under the act, Sullivan's argument that the STVCP constituted a "special contract" prohibited by the act necessarily fails as well. See G. L. c. 149, § 148 ("No person shall by a special contract with an employee or by any other means exempt himself from this section"); Fraelick v. PerkettPR, Inc., 83 Mass. App. Ct. 698, 707 (2013) ("The Wage Act prohibits an employer from exempting itself from the timely and complete payment of wages by 'special contract'" [emphasis added; citation omitted]).

12

385, cert. denied sub nom. Globe Newspaper Co. v. Ayash, 546 U.S. 927 (2005) ("The scope of the covenant is only as broad as the contract that governs the particular relationship").

Judgment affirmed.

By the Court (Neyman,
  Ditkoff & Englander, JJ.[7]),

Clerk

Entered:  December 4, 2025.

---

[7] The panelists are listed in order of seniority.