NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-177                                          Appeals Court
18-P-178


DANIEL J. O'CONNOR & another[1]  vs.  EDDIE F. KADRMAS.

DANIEL J. O'CONNOR  vs.  KADRMAS EYE CARE NEW ENGLAND, P.C., &
another.[2]


Nos. 18-P-177 & 18-P-178.

Plymouth.      December 5, 2018. - October 18, 2019.

Present:  Green, C.J., Wolohojian, & Wendlandt, JJ.


Corporation, Close corporation, Stockholder, Officers and
     agents.  Contract, Implied covenant of good faith and fair
     dealing.  Damages, Breach of fiduciary
     duty.  Fiduciary.  Waiver.  Massachusetts Wage
     Act.  Practice, Civil, Summary judgment.



     Civil actions commenced in the Superior Court Department on
September 20, 2013, and January 11, 2016.

     The cases were heard by Angel Kelley Brown, J., on motions
for summary judgment.


     Timothy J. Perry for Eddie F. Kadrmas.
     Russell J. Fleming for Kadrmas Eye Care New England, P.C.

_____

     [1] Opthalmic Consultants of Boston, Inc.

     [2] Eddie F. Kadrmas.

Brian H. Lamkin for Daniel J. O'Connor & another.

WOLOHOJIAN, J.  These two cases arise out of the unhappy breakup of an ophthalmology practice.[3]  Only two issues are before us.  The first is whether, in no. 18-P-177 (which we shall call the common law case), summary judgment was properly entered against Eddie F. Kadrmas on his counterclaims for breach of fiduciary duty and breach of contract against Daniel J. O'Connor.  The second is whether, in no. 18-P-178 (which we shall call the Wage Act case), summary judgment was properly entered in favor of O'Connor on his Wage Act and breach of contract claims.[4]  In the common law case, we reverse the ruling on Kadrmas's breach of fiduciary duty claim because there are genuine issues of material fact sufficient to go to a jury, and affirm the dismissal of Kadrmas's contract claim because he has not shown damages.  In the Wage Act case, we conclude that compensation due under paragraph V(a) of the stock agreement does not constitute "wages" within the meaning of G. L. c. 149, § 148 (Wage Act), and therefore reverse summary judgment in

---

[3] The cases are not consolidated but share common facts and were disposed of together below.

[4] Both cases raised other claims, defenses, and counterclaims, and involved additional parties.  However, none of those are at issue here, either because they were disposed of below, including by stipulation of dismissal, or because no argument is raised concerning them on appeal.

O'Connor's favor on his Wage Act claim. Also in the Wage Act case, we affirm the entry of summary judgment in O'Connor's favor on his contract claim because Kadrmas failed to raise any genuine issue of disputed fact.

Factual background. On August 8, 2005, Charles T. Post, Kadrmas, and O'Connor entered into a stock agreement whereby Kadrmas, at O'Connor's and Post's invitation, joined them in their ophthalmology practice in Plymouth, which was renamed Post, O'Connor & Kadrmas Eye Centers, P.C. (POK).[5] The stated objectives of the stock agreement were to "provide for the continuity and maintenance of the proficient management, control and operation of the business of the [c]orporation," and to "restrict the transfer of the shares of the [c]orporation and . . . the disposition of the shares of a deceased or retiring [s]hareholder." Consistent with this, most of the agreement deals with matters of corporate governance and share ownership, transfer, and disposition.

However, one paragraph of the stock agreement (paragraph V) concerns the shareholders' professional responsibilities to POK, and the compensation they were to receive as shareholders. In broad summary, paragraph V provides (1) that each shareholder

_____

[5] Kadrmas paid approximately $195,000 in exchange for a one-third interest in the practice.

"agrees to devote his full time and attention . . . to performing medical services on behalf" of POK, (2) that POK agrees to provide all necessary office, administrative, medical, and other supplies and support, and (3) a formula for calculating each shareholder's entitlement to the net profit of POK. That formula calculated each shareholder's entitlement to POK's net profit based on his percentage contribution to the entire "net collections" of the three shareholders.[6] Thus, to

_____

[6] Paragraph V of the stock agreement provides as follows:

"Shareholder agrees to devote his full time and attention in the practice of medicine to performing medical services on behalf of the Corporation to the best of his ability. It is expressly understood and agreed that any services rendered by any Shareholder to patients who express a wish to engage him personally shall nevertheless in fact be rendered to such patient by Shareholder as an employee of the Corporation; that all statements rendered for such services shall be by the Corporation; and that all fees or other remuneration received by the Corporation.

"(a) Each Shareholder shall be compensated for his services to the Corporation based on his 'net collections' after payment of all overhead costs and direct expenses as defined further in paragraph (b) below. 'Net Collections' shall mean all amounts collected by the Corporation related to services provided by the Shareholder.

"(b) The Corporation agrees to make available to Shareholder such office, space, furniture, furnishings, equipment, medical drug and supplies, secretarial, technical and nursing assistance as the Corporation deems reasonably necessary or appropriate to the proper

illustrate, if a particular shareholder's practice generated five percent of the "net collections" of the three shareholders collectively, then that shareholder would receive five percent of the net profit of the entire corporation. Had the parties not arranged matters in this way, the net profit of the corporation would instead have been distributed in thirds, consistent with each shareholder's percentage ownership of the shares in the corporation, which was a Subchapter S corporation (S corporation).[7]

The parties thereafter profitably operated POK under the stock agreement, with O'Connor acting as president, Post as treasurer, and Kadrmas as secretary. POK had nine physicians and optometrists and a number of other employees. POK also had

---

performance of the Shareholder's professional services hereunder. The Corporation shall pay all the reasonable costs associated with the Shareholder's practice of medicine; however each Shareholder shall pay 'overhead costs' in a manner consistent with the historical allocation of such costs of the Corporation which shall include such items as rents, electricity, telephone expenses, general liability insurance, and other expenses that may be attributed to a specific Shareholder."

[7] "When a small business corporation elects to be an S corporation, its earnings or income is not taxed at the corporate entity level but is passed through and taxed to the individual shareholders on a pro rata basis, determined by each shareholder's percentage ownership interest in the corporation; the pass-through occurs whether or not the income is actually distributed." J.S. v. C.C., 454 Mass. 652, 660 n.10 (2009).

a relationship with Plymouth Laser and Surgical Center, P.C. (PLSC), which was owned by O'Connor and Post (but not Kadrmas). PLSC provided ophthalmic laser and surgical services, and granted operating privileges to physicians (including Kadrmas). PLSC was located in the same building as POK, and the two entities shared certain costs, although there was no written agreement to share expenses.

Beginning in 2008, O'Connor, Post, and Kadrmas began discussing a possible merger of POK with Ophthalmic Consultants of Boston, Inc. (OCB), an ophthalmology practice that was interested in expanding into the Plymouth market. By the spring of 2011, Post and O'Connor favored a deal with OCB, but Kadrmas did not -- at least in part because OCB refused to hire his (Kadrmas's) wife as part of the deal. O'Connor and Post decided (secretly, Kadrmas alleges) to try to move forward without Kadrmas but, in August 2011, OCB stated it was not interested in a merger until the three shareholders had resolved their differences.

On June 20, 2012, Candescent Partners -- an unrelated entity -- made an offer to acquire both POK and PLSC for $7 million and to employ O'Connor and Kadrmas. Post, who planned to retire, was in favor of this deal. However, the proposed compensation for O'Connor and Kadrmas would be less than what

they received from POK; thus O'Connor and Kadrmas did not favor the deal, and POK rejected Candescent's offer.

Not long thereafter, on July 10, 2012, OCB notified O'Connor, Post, and Kadrmas that its board of directors had voted to terminate merger discussions. OCB, however, continued with its plan to enter the Plymouth market and, to that end, hired Kathleen Murphy, the longtime administrator of POK, who had close and longstanding ties to O'Connor and Post, to help set up a Plymouth operation. O'Connor then contacted OCB to reinitiate discussions about himself alone becoming affiliated with OCB. OCB agreed to discuss this option, provided O'Connor remove himself from POK after giving one year's notice as required under the stock agreement.

On November 16, 2012, O'Connor gave notice of his intent to terminate his services, sell his shares in accordance with the stock agreement, and resign as an officer, director, and shareholder of POK. Not until five months later, however, did O'Connor disclose that he intended to leave POK in order to go to OCB. In response to the information that O'Connor intended to leave for a direct competitor, Kadrmas demanded to know O'Connor's departure date and stated that "[i]t is not in the best interests of the practice for us to simply allow you to plan to go into competition with POK, lay the groundwork for that competition, keep us guessing at your departure date and

then walk out the door when a competing entity is set to go."

He continued:

> "I am glad that you finally stated the obvious in your email, i.e, that it is your 'intent is [sic] to join OCB' after you depart.  Your prior lawyers had denied you were negotiating with OCB even after it became clear that that denial was not true.  The fact that you are planning to join our direct competitor is not consistent with furthering the best interests of POK.  Because of this, I believe it only makes sense that you resign your position as a shareholder during the pendency of your planned exit -- i.e. immediately.  Otherwise, you have an impermissible and irresistible conflict of interest."[8]

Kadrmas further stated that he would not allow O'Connor to solicit POK employees or doctors.

Over Kadrmas's protests, O'Connor, Post, and Murphy continued with their plans to join OCB.  Accordingly, on June 28, 2013, O'Connor signed "term sheets" concerning his future affiliation with OCB.  On the same day, O'Connor and Post executed a term sheet for the sale of some PLSC shares to certain members of OCB.  On August 1, 2013, Post sold twenty

---

[8] Kadrmas continued on a different front:  "I have also recently learned that [Murphy] set up a system where I have been unknowingly paying a portion of expenses of PLSC of which I do not have ownership interest.  Apparently, under the system that was set up, PLSC has been paying POK a flat rate of $4500 per month for its expenses.  However, the real expense of PLSC being fronted by POK is $15104.65 per month.  Therefore, there is a shortfall of $10604.65 in payment to POK each month.  For one year it becomes $127,235.80.  Since this expense would have been fairly shared 3 ways -- the portion I was overcharged is $42,418.60 per year.  Since this has occurred without my knowledge for the 8 years that I have been a partner at POK, I am owed $330,348.80 from PLSC."

percent of his PLSC shares, and PLSC merged with OCB. Kadrmas's surgical privileges at PLSC were not renewed, thus leaving him no convenient venue for performing surgeries.

Relations between the three shareholders, which were already acrimonious, deteriorated further as O'Connor's and Post's departures solidified and approached. On October 4, 2013, Post notified O'Connor and Kadrmas that he wished to retire and gave his one-year notice under the stock agreement; he asked whether they would buy his shares immediately. O'Connor was set to depart on or before March 1, 2014. Murphy began employment with OCB on January 1, 2014, and immediately began to help with the process of filling positions for OCB's new office, which was located in the same office complex as POK.

On January 29, 2014, the pictures and biographies of six POK doctors appeared on OCB's website, where they were seen by a patient who informed Kadrmas. All six were still employees of POK. Kadrmas's counsel immediately e-mailed O'Connor's counsel and demanded that the information be taken off the website and that O'Connor cease and desist from soliciting POK physicians and other employees. O'Connor was still the president of POK when this occurred but took no action to remove the information from the website. However, the pictures and biographies were removed the same day.

Less than one month before O'Connor's departure date, on what came to be referred to as "D-day," February 12, 2014, twelve POK employees (who included some, but not all, of the doctors who had previously appeared on OCB's website, as mentioned above) gave written notice of their resignation from POK, effective at the end of February or early March. This mass departure was timed to coincide with O'Connor's departure from POK, which occurred on February 28, 2014. All twelve employees left to join O'Connor at OCB,[9] and began working at OCB the first week of March 2014.

In a supplemental response to an interrogatory seeking disclosure of experts and their opinions, Kadrmas identified three experts and their expected testimony regarding (1) Kadrmas's loss of income on and after December 31, 2013, as caused by the actions of O'Connor and others, and (2) the fair market value of Kadrmas's one-third interest in POK at different points in time. In summary, the experts' opinion was that, as a consequence of the departures of O'Connor and other POK doctors and staff, Kadrmas lost $1,990,000 in income for 2014 through 2016. Further, the experts opined that POK's fair market value as of June 19, 2012 (the date of Candescent's offer to purchase

---

[9] Since March 1, 2014, Kadrmas has been the sole officer and shareholder of POK.

POK) was $3,262,000, and Kadrmas's one-third interest was accordingly valued at $1,087,333.33. As of December 31, 2016, however, POK had a value of negative $210,000, and Kadrmas's one-third interest had no value. In reaching this conclusion, the experts pointed to (among other things): (1) Kadrmas had received virtually no compensation for three years after December 31, 2013, despite there being no diminishment in his collections or workload, (2) there was no market for an ophthalmology practice operating in this manner, where the industry expectation was a thirty-five percent return on billable collections, and (3) there had been no offers to purchase POK or its stock since the mass departure of O'Connor and others.

Pertinent procedural background.[10]  1.  The common law case. O'Connor and OCB brought the common law case against Kadrmas asserting a variety of claims in order to resolve various patient and practice separation issues that the parties could not resolve among themselves.[11]  In response, Kadrmas asserted numerous counterclaims, only two of which are currently at

---

[10] We recite only the procedural background pertaining to the issues before us, recognizing that we are omitting information about additional parties, claims, and issues involved at earlier points in the two litigations.

[11] The common law case was filed on September 20, 2013, months before O'Connor's departure from POK.

issue: O'Connor breached his fiduciary duty as a shareholder in a close corporation, and O'Connor breached the terms of the stock agreement. Kadrmas's breach of fiduciary duty counterclaim rested on three theories: first, that O'Connor breached the duties of full disclosure and fidelity with respect to his dealings with OCB; second, that O'Connor breached the duty to promote POK's interests and those of his fellow shareholders over his own self-serving interests; and third, that O'Connor failed to refrain from self-dealing at the expense of POK and Kadrmas. Kadrmas's breach of contract counterclaim did not specifically allege any particular provision of the stock agreement that had been breached, but in answers to interrogatories, he stated that numerous provisions of the agreement had been breached,[12] as well as the implied covenant of good faith and fair dealing.

O'Connor moved for summary judgment on the counterclaims. With respect to the fiduciary duty claim, O'Connor argued both that the record failed to show that he had breached any duty, and that, in any event, Kadrmas could not prove causation or damages. The judge ruled that, although there were genuine issues of material fact as to whether O'Connor breached his

---

[12] Specifically, Kadrmas claimed violation of paragraphs I, II(b), III, V, and VI of the stock agreement.

fiduciary duties by secretly negotiating with OCB to the benefit of PLSC but at POK's expense, and by engaging in an effort to freeze him out of POK, Kadrmas could not prove damages. Similarly, the judge concluded that, although genuine issues of material fact existed as to whether O'Connor improperly solicited employees to join OCB while he (O'Connor) was still a shareholder, director, and president of POK, Kadrmas could not prove that O'Connor's conduct caused him any damages.

As to the breach of contract claim, the judge carefully assessed each of the numerous individual provisions of the stock agreement that Kadrmas alleged had been violated, and concluded that Kadrmas had no prospect of proving any such violations.[13] The judge did not explicitly address the implied covenant of good faith and fair dealing, which Kadrmas raised only cursorily in his papers.

2. The Wage Act case. O'Connor filed the Wage Act case on January 11, 2016, after having earlier filed a nonpayment of wage complaint with the Attorney General's office and received a right to sue letter. Of the numerous claims and counterclaims asserted in the Wage Act case, only two are before us now: O'Connor's claim under G. L. c. 149, § 148, against Kadrmas and

---

[13] Kadrmas does not challenge on appeal the judge's conclusion with respect to the individual provisions of the stock agreement.

Kadrmas Eye Care New England, P.C., for failure to pay him for wages owed, and O'Connor's claim that Kadrmas and POK breached the stock agreement by failing to pay him compensation due under paragraph V(a).  See note 6, supra, for text of paragraph V(a).  The claims were based on the allegation that Kadrmas withheld O'Connor's December 2013 quarterly payment ($164,762), as well as subsequent amounts due and calculable under paragraph V(a) of the stock agreement.  On cross motions for summary judgment, the judge concluded that amounts due under paragraph V(a) constituted "wages" within the meaning of the Wage Act and thus granted summary judgment in O'Connor's favor on his Wage Act claim.  The judge also concluded that Kadrmas failed to raise a disputed issue of material fact with respect to O'Connor's contract claim and entered judgment in O'Connor's favor on that claim as well.

Discussion.  1.  The common law case.  a.  Fiduciary duty.  On appeal, Kadrmas argues that the summary judgment record showed that O'Connor, "while acting as President of POK, aimed all of his activities for a full year prior to his departure at benefiting OCB and harming POK in the wake of his departure."[14]

---

[14] Although Kadrmas also briefly states in his brief that the judge correctly determined that he had sufficiently showed that O'Connor breached his fiduciary duty by enlisting the help of counsel to freeze Kadrmas out of the potential merger with OCB, he offers no argument concerning the judge's conclusion that this theory fails because there is no evidence of causation

This included, in Kadrmas's view, secretly helping to set up a competing enterprise (OCB) within a mile of POK, secretly planning to solicit patients, referral sources, and key personnel away from POK, secretly planning to withdraw Kadrmas's surgical privileges at PLSC, and failing to help locate or hire replacements for the departing (solicited) employees -- all done while O'Connor was president of POK and Kadrmas's fellow shareholder in a close corporation.

The summary judgment record, taken in the required light, sufficiently supports each of these factual contentions. Although O'Connor stresses that there is no direct evidence that he solicited employees, direct evidence is not necessary where, as here, the circumstantial evidence, together with the reasonable inferences to be drawn from it, suffices. See Godfrey v. Globe Newspaper Co., 457 Mass. 113, 119 (2010) ("In deciding a motion for summary judgment, the motion judge must consider all factual allegations, and draw all reasonable inferences therefrom, in favor of the nonmoving party").  The timing, sequence, and circumstances surrounding the employees' mass exodus from POK, especially viewed against the background

---

or damages flowing from the never-consummated merger.  We accordingly treat this theory of his fiduciary duty claim as waived.  See Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 35 n.1 (2005) (waiver where argument is not made on appeal from summary judgment).

of the shareholders' acrimonious relationship and dealings leading up to it, are sufficient to permit a reasonable inference that O'Connor had a hand in the employees' departure even while he was still an officer and shareholder of POK.

In a close corporation, such as POK, shareholders owe "each other a fiduciary duty of the 'utmost good faith and loyalty.'"  O'Brien v. Pearson, 449 Mass. 377, 383 (2007), quoting Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 593 (1975).  "[A]s in a partnership, 'the relationship among the stockholders [of a close corporation] must be one of trust, confidence and absolute loyalty if the enterprise is to succeed.'"  Selmark Assocs., Inc. v. Ehrlich, 467 Mass. 525, 536 (2014), quoting Donahue, supra at 587. Although O'Connor was certainly free to leave POK for a competitor provided he complied with the terms of the stock agreement, as long as he remained a shareholder and officer of POK, his fiduciary duties were to POK and his fellow shareholders.  See Chelsea Indus., Inc. v. Gaffney, 389 Mass. 1, 11-12 (1983).  During that time, he had a duty not to frustrate the reasonable expectations of Kadrmas, whether by soliciting POK doctors or employees, refusing to hire replacement doctors while he remained president of POK, or otherwise taking steps designed to gut POK's and Kadrmas's ability to compete with OCB or to recover from O'Connor's departure.  See Pointer

v. Castellani, 455 Mass. 537, 550 (2009) ("A breach of fiduciary duty through a freeze-out also occurs when the reasonable expectations of a shareholder are frustrated").  O'Connor was free to do all of these things after he left POK; the problem for him here is that the record permits the inference that he did not wait until his departure.

That leaves us with the question whether the judge was correct when she concluded that Kadrmas could not prove causation or damage resulting from O'Connor's breaches of fiduciary duty, despite the opinion of Kadrmas's experts.  She reached this conclusion because there was no reduction in the number of patients Kadrmas saw or billed after O'Connor's departure.  But POK was never a one-physician shop; Kadrmas's expectations were not based on a solo practice, nor was his compensation based solely on his own gross billings.  The question of Kadrmas's loss is not limited to whether he was able to see as many patients and bill them as much as before O'Connor left.  Instead, the pertinent question is whether O'Connor's alleged breaches of fiduciary duty caused Kadrmas damage and, if so, in what amount.  See Augat, Inc. v. Aegis, Inc., 417 Mass. 484, 488 (1994) (plaintiff must show what portion of losses are attributable to defendant's misconduct).  The proper remedy for breach of fiduciary duty is to "restore to the minority shareholder those benefits which she reasonably expected, but

has not received because of the fiduciary breach." Brodie
v. Jordan, 447 Mass. 866, 870-871 (2006).

This inquiry requires not only an assessment of Kadrmas's
billings, but also of his compensation -- which, as provided in
paragraph V(a) of the stock agreement depended on the net
profits of the corporation. All this was set out in Kadrmas's
experts' opinion. While acknowledging that "Kadrmas's
contribution to the [p]ractice in terms of patients seen and
patient billings was not impacted by the departure of Dr.
O'Connor, the two doctors and twelve staff members," the experts
concluded that "the value of the [p]ractice and compensation to
Dr. Kadrmas has greatly declined due to the loss of revenue and
other business issues created by the mass exodus that followed
Dr. O'Connor to OCB." More specifically, Kadrmas's aggregate
annual compensation in the two years before O'Connor's departure
was $866,212 (in 2012) and $754,891 (in 2013).[15] But in 2014,
his aggregate compensation dropped to $110,000 and in 2015 it
fell to $91,099. The practice's 2016 revenues were more than
thirty percent less than 2012, and Kadrmas was required to lend
the practice $100,000 in each of 2014 and 2015.

---

[15] O'Connor's aggregate compensation from POK was $1,107,736
in 2012 and $981,596 in 2013.

The experts' opinion, together with the facts underlying it, was sufficient to put the question of damages to the jury with respect to the breach of fiduciary duty theory Kadrmas has argued on appeal, which we identified in the first paragraph of this section of our opinion.  See Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 414 (2003) ("It is the function of the jury to assess and weigh the soundness and credibility of an expert opinion").

b.  Breach of the implied covenant of good faith and fair dealing.  Kadrmas argues that the judge erred when she dismissed his contract counterclaim without considering his argument that O'Connor, together with Post and Murphy, and with the help of counsel, violated the covenant of good faith and fair dealing by engaging in a freeze-out scheme when they pursued negotiations in 2012 to sell PLSC (in which Kadrmas had no stake) at a premium to OCB, and to decrease the value of POK (in which Kadrmas had a stake).  Among other things, O'Connor argues that Kadrmas's argument is waived.  We thus turn first to the origins and evolution of Kadrmas's argument as he articulates it now on appeal.

Kadrmas's contract counterclaim made no mention of the implied covenant of good faith and fair dealing.  However, in a supplemental response to an interrogatory seeking to know the bases for his contract claim, Kadrmas stated (among other

things) that the claim was based on breach of the covenant of good faith and fair dealing implicit in the stock agreement.  In his supplemental response to interrogatory no. 3, Kadrmas further stated that "the actions that constitute a breach of the implied covenant are set forth in [i]nterrogatory No. 2, above, and are the same that constitute the breaches of fiduciary duty set forth below in Response to [i]nterrogatory 5."[16]  When it came time to oppose O'Connor's motion for summary judgment, Kadrmas took a similarly broad-brush approach, stating only that "[t]he freeze-out scheme set forth in detail in the [a]dditional [f]act section of the [c]onsolidated [f]acts submitted herewith amply sets out a breach of the covenant of good faith and fair dealing."  Whatever else might be said about these contentless and vague statements, they obviously did not comply with Kadrmas's responsibility, under Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974), to provide a "response, by affidavits or as otherwise provided in this rule, [to] set forth specific facts showing that there is a genuine issue for trial."

---

[16] In other words, Kadrmas's breach of the implied covenant claim and breach of fiduciary duty claim are duplicative to the extent that they each rest on his allegations concerning the 2012 freeze-out scheme.  As we noted above in note 14, Kadrmas has waived on appeal any claim that the judge erred when she concluded that he had failed to present sufficient facts to show causation or damages with respect to the 2012 freeze-out scheme as part of his fiduciary duty claim.

Even were we to overlook the deficiencies of Kadrmas's papers below, summary judgment was properly entered on the implied covenant claim. Although we assume that the summary judgment record was sufficient to show that O'Connor, in concert with Post and Murphy, attempted to freeze Kadrmas out by negotiating a deal with OCB in 2012 that did not include Kadrmas and would work to his and POK's detriment, it is undisputed that no transaction resulted from these efforts. And, perhaps more importantly, Kadrmas's own experts identified no loss to him from the fruitless 2012 scheme. Indeed, the experts' opinion made no mention at all of the 2012 freeze-out efforts, pointing to the bona fide offer from Candescent only for purposes of establishing fair market value of POK at that time. Without a showing of compensable loss, Kadrmas is not entitled to maintain his claim for breach of the implied covenant. See Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 388 (2005) (must show economic loss resulting from breach of implied covenant of good faith and fair dealing).

2. The Wage Act case. O'Connor's Wage Act and contract claims are both based on his contention that Kadrmas, POK, and Kadrmas Eye Care New England, P.C. (KEC)[17] wrongfully failed to

---

[17] Kadrmas created KEC in 2014 to continue the practice after O'Connor and Post left POK.

pay him compensation due under paragraph V(a) of the stock agreement.  O'Connor contends that he did not receive his December 2013 quarterly distribution, or amounts that were due him in 2014 and 2015 for patient revenue he generated before his departure from POK.  It is undisputed that these payments were withheld, although the parties dispute why.[18]

O'Connor moved for summary judgment on both claims (Wage Act and contract).  Kadrmas's opposition to that motion was directed only to the Wage Act claim and offered no specific argument directed to the contract claim.  Indeed, the title of Kadrmas's opposition memorandum and its opening paragraph stated that he was opposing O'Connor's motion only with respect to the Wage Act claim, and the conclusion asked only that the Wage Act claim be dismissed.  Kadrmas also cross moved for summary judgment on the Wage Act claim.

After argument on the cross motions, Kadrmas filed an emergency motion to correct what he called a scrivener's error on the cover page of his summary judgment opposition.

---

[18] POK's practice was to cut checks to the three shareholders for the final quarterly distribution, even though the figures would not become final until sometime the following year.  The shareholders were then expected to not cash the checks until the figures were finalized, and they complied with that expectation.  Following this practice, O'Connor received a check for the December 2013 quarterly distribution, but did not deposit or cash it.  Later, Kadrmas caused the check to be voided because, in his view, there were no net profits.

Specifically, he asked to replace the first page of his opposition with one that referred to the contract claim in the title and the opening paragraph.  Kadrmas's motion to correct scrivener's mistake stated:

> "It is Dr. Kadrmas's position that for the same reasons that the Wage Act claim fails, the contract claim 'as regards unpaid wages' also fails.  Therefore, no additional argument is needed than that which is set forth in the brief."

The judge allowed the motion to correct this so-called scrivener's error, a ruling O'Connor has not appealed. Notwithstanding the "correction," the judge concluded that Kadrmas failed to raise a disputed issue of fact concerning the contract claim, and directed that judgment enter in O'Connor's favor.  She also concluded that amounts due under paragraph V(a) constitute wages within the meaning of the Wage Act.

a.  <u>Wage Act claim</u>.  The Wage Act requires that a terminated employee be paid his "wages" expeditiously after his or her termination.  See G. L. c. 149, § 148.  "The statute applies to wages, to holiday and vacation pay, and, 'so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee.'"  <u>Suominen</u> v. <u>Goodman Indus. Equities Mgmt. Group, LLC</u>, 78 Mass. App. Ct. 723, 737 (2011), quoting G. L. c. 149, § 148.  The question here is whether distributions pursuant to

paragraph V(a) of the stock agreement are "wages" within the meaning of the Act.  That question cannot be answered without reference to the stock agreement, the interpretation of which is a question of law we review de novo.  See James B. Nutter & Co. v. Estate of Barbara A. Murphy, 478 Mass. 664, 667 (2018).

We begin by noting that the stock agreement controlled Kadrmas's entry into Post's and O'Connor's ophthalmology practice as a shareholder.  Kadrmas paid approximately $195,000 for a one-third interest in the practice, which was renamed POK. The stated purposes of the stock agreement were (1) "to provide for the continuity and maintenance of the proficient management, control and operation of the business of the [c]orporation," and (2) to "restrict the transfer of the shares of the [c]orporation and [to] provide for the disposition of the shares of a deceased or retiring [s]hareholder."  Consistent with these stated objectives, most of the stock agreement's provisions dealt with the holding, transfer, or other disposition of shares, and with governance of the corporation.  Paragraph V, however, deals with how each shareholder "shall be compensated for his services to the [c]orporation" in exchange for devoting "his full time and attention in the practice of medicine to performing medical services on behalf of the [c]orporation."  As we have set out above, compensation under paragraph V(a) was to be calculated using a formula that applied each shareholder's percentage of

gross billings to the net profit of the corporation.  This arrangement was designed to avoid having the net profit of the corporation distributed according to each partner's one-third ownership interest, which it otherwise would have been as a pass-through S corporation.

Whatever else might be said about the stock agreement, it is not an employment agreement as that term is commonly understood; by its terms, it is an agreement among shareholders with respect to their dealings with each other and the corporation.  The stock agreement does not refer to O'Connor, Post, or Kadrmas as employees, but rather as shareholders.[19] Similarly, the stock agreement nowhere states or implies that the shareholders are employed by the corporation; instead they are identified as owners and officers of the corporation.  Each individual's relationship to the corporation is defined by reference to his ownership of stock in the corporation, and the duration of that relationship is tied to his continued ownership of that stock.

"Wages" are salary (or more colloquially "pay"), from an employer to an employee, including holiday and vacation pay, and

---

[19] We acknowledge that the stock agreement also contains a couple of references to the shareholders as employees, but do not consider those stray and isolated references to be dispositive, especially given the context in which they appear.

certain delineated commissions.  G. L. c. 149, § 148.  As reflected in the numerous references in the statute along these lines, common indicia of salary or pay are that they are of an amount established ahead of time and paid on a regular schedule, such as "weekly or bi-weekly."  Id. ("Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him" within certain time after "termination of the pay period during which the wages were earned").  See Prozinski v. Northeast Real Estate Servs., LLC, 59 Mass. App. Ct. 599, 604 (2003) ("G. L. c. 149, § 148, refers to 'weekly' or 'biweekly' wages having been earned during a particular pay period").  Compensation of this sort can be neither discretionary nor contingent in order to be considered "wages" within the meaning of the Wage Act.  Mui v. Massachusetts Port Auth., 478 Mass. 710, 713 (2018).  See Weems v. Citigroup Inc., 453 Mass. 147, 153-154 (2009) (employee bonuses that were discretionary not wages under Wage Act); Prozinski, supra at 603 (severance pay not wages because contingent upon severance).

"The only contingent compensation recognized expressly in the act is commissions, which are considered wages when they 'ha[ve] been definitely determined and due and ha[ve] become payable to [the] employee.'"  Mui, 478 Mass. at 713, quoting G. L. c. 149, § 148.  "The term 'commission' is commonly

understood to refer to compensation owed to those in the business of selling goods, services, or real estate, set typically as a percentage of the sales price."  Suominen, 78 Mass. App. Ct. at 738.  A payment based on a percentage of the business's overall profits is not a commission.

With these principles in mind, it is clear that the distributions under paragraph V(a) of the stock agreement are not "wages" within the scope of the Wage Act.  Most fundamentally, they are not compensation from an employer to an employee, but rather profit distributions to shareholders to which they are entitled because of their ownership interest in the corporation, not because of their employment.  Moreover, we note the highly contingent nature of the profit distributions, which depended on a number of variables, including the billings and revenues generated by other doctors.  In sum, the profit distributions are not salary, pay, or commissions.  Accordingly, O'Connor was not entitled to summary judgment in his favor on his Wage Act claim, and Kadrmas's cross motion for summary judgment should have been allowed.

b.  Contract claim.  Kadrmas argues that the judge erred in granting summary judgment in O'Connor's favor on his contract claim.  Among other things, O'Connor responds that Kadrmas's arguments were not preserved below and are waived.

Having carefully reviewed the record, we agree that Kadrmas's appellate arguments were not properly preserved below. Kadrmas's opposition to O'Connor's motion for summary judgment -- even after the correction of the so-called scrivener's error -- did not explain, with reference to law or the record, why O'Connor was not entitled to judgment on his contract claim. For example, the argument headings in his opposition make no mention whatsoever to the contract claim,[20] and the discussions that follow those headings are likewise silent as to how they relate to O'Connor's contract claim. And, as we noted above, the summary judgment opposition's conclusion asked only that the Wage Act claim be dismissed. While we may affirm on "any ground apparent on the record that supports the result reached in the [trial] court," Gabbidon v. King, 414 Mass. 685, 686 (1993), it is another matter to reverse on a ground not adequately raised below. See Royal Indem. Co. v. Blakely, 372

---

[20] The argument headings were: (1) "Count III of the 2016 Action (Wage Violation) Must be Dismissed"; (2) "Agreements to Share Profits Are Not Wages Under the Act"; (3) "The Preliminary Profit Reports Were Merely Projections And Did Not Reflect Commissions That Were Definitely Determined Or Due and Payable"; (4) "The Fact That Checks for the Preliminary Profit Distribution Were Cut and Voluntarily Withheld By the Shareholders Shows That These Were Not Wages"; and (5) "The December 31, 2013 Shareholder Distribution Checks Could Not be Cashed Because the Estimated Profits Did Not, In Fact, Exist And the Company's Bank Accounts Had Insufficient Funds to Cash The Checks."

Mass. 86, 87-88 (1977) (need not consider issues not raised at trial where appellee might be prejudiced by appellant's failure to have done so).

Even were we to overlook his waiver, Kadrmas has not shown that the judge erred when she concluded that he had failed to raise "a genuine issue of material fact with respect to whether he breached Paragraph V of the [s]tock [a]greement by failing to make the December 2013 quarterly payment and failing to pay O'Connor his net collections for 2014."  As we noted above, Kadrmas's opposition to O'Connor's motion for summary judgment did not discuss the contract claim, either with legal citations or references to the summary judgment record.[21]  The judge certainly was not required to imagine how Kadrmas's Wage Act arguments might apply to O'Connor's contract claim, or to herself fill the lacunae in Kadrmas's opposition.  Nor was the judge required to hunt through the record to determine whether there were disputed issues of material fact that could preclude summary judgment in O'Connor's favor.  See Mass. R. Civ. P. 56 (e); Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 46 n.18 (2005).

---

[21] Except for citations to Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991), and Godbout v. Cousens, 396 Mass. 254, 261 (1985), for the summary judgment standard, Kadrmas's opposition cited only Wage Act cases.

Conclusion.  For the reasons set out above, in no. 18-P-177, we reverse so much of the judgment as pertains to Kadrmas's counterclaim for breach of fiduciary duty on the theory that O'Connor, while president of POK, acted to benefit OCB and harm POK in the wake of his departure, which is the only theory of the claim that survives this appeal, and remand that matter for further proceedings consistent with this opinion; the judgment is otherwise affirmed.  In no. 18-P-178, we reverse the portion of the judgment that awarded $1,258,557 in favor of O'Connor on his Wage Act claim and direct that judgment be entered in Kadrmas's favor instead; we affirm the judgment in all other respects, including the award of $419,519 in favor of O'Connor on his contract claim.

So ordered.